UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 18-028 |
| **v.** | : | |
| | : | |
| **JARRELL HARRIS,** | : | May 11, 2018 |
| | : | 11:00 a.m. |
| | : | |
| | : | |
| **Defendant.** | : | Washington, D.C. |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:          **Anthony Scarpelli, Assistant U.S.
Attorney, Assistant U.S. Attorney**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-6954
Email: Anthony.scarpelli@usdoj.gov

For the Defendant:          **Loui Itoh, Assistant Federal Public
Defender**
FEDERAL PUBLIC DEFENDER FOR THE
DISTRICT OF COLUMBIA
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
(202) 208-7500
Fax: (202) 208-7515
Email: Loui_itoh@fd.org

Also Present:

For the Office of the            **Andrew J. Saindon, Senior**
Attorney General:                **Assistant Attorney General**
                                 OFFICE OF THE ATTORNEY GENERAL FOR
                                 THE DISTRICT OF COLUMBIA
                                 One Judiciary Square
                                 441 4th Street, NW
                                 Washington, DC  20001
                                 (202)724-6643
                                 Fax: (202)730-1470
                                 Andy.saindon@dc.gov


For the D.C. Department          **Maria Amato, General Counsel**
of Corrections, Office of        D.C. Department of Corrections,
the Attorney General             Office of the Attorney General
                                 2000 14th Street, NW, 7th Floor
                                 Washington, DC  20009
                                 (202)671-2042
                                 Maria.amato@dc.gov


                                 **Latoya Lane, Ph.D.**
                                 **Deputy Director for Operations**
                                 D.C. Department of Corrections,
                                 2000 14th Street, NW, 7th Floor
                                 Washington, DC  20009
                                 (202)671-2042
                                 Latoya.lane@dc.gov


Court Reporter:                  **Scott L. Wallace, RDR, CRR**
                                 Official Court Reporter
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1          <u>**MORNING SESSION, MAY 11, 2018**</u>

2   (11:23 a.m.)

3          THE COURTROOM CLERK:  Your Honor, this is criminal case

4   18-028, *United States of America versus Jarrell Harris*.

5          Will all parties please come forward to the lectern and

6   identify yourselves for the record.

7          MR. SCARPELLI:  Good morning, Your Honor.  Anthony

8   Scarpelli on behalf of the United States.

9          THE COURT:  Good morning, Counsel.

10          MR. ITOH:  Good morning, Your Honor.  Loui Itoh on behalf

11   of Mr. Harris.

12          THE COURT:  Good morning, Counsel.  Mr. Harris, how are

13   you?

14          THE DEFENDANT:  Good.  How are you doing?

15          THE COURT:  Pretty good.  You?

16          THE DEFENDANT:  I'm doing well.

17          MR. SAINDON:  Good morning, Your Honor.  Andrew Saindon on

18   behalf of the Department of Corrections.

19          THE COURT:  Good morning.  Good to see you.  How are you?

20          MR. SAINDON:  Good.

21          THE COURT:  I'm going to deal with the federal criminal

22   matter first, and then we'll focus on the order.  I know we have

23   another hearing scheduled for the 21st.  Speedy trial was tolled

24   through the 21st, I believe.

25          MR. ITOH:  That's correct, Your Honor.

```
 1         THE COURT:  Mr. Harris is here only because of the related
 2   order I issued, but are there any representations to be made with
 3   respect to the federal criminal charge or any problems, any
 4   issues or anything?
 5         MR. SCARPELLI:  I don't believe so, Your Honor.  Ms. Itoh
 6   and I, as well as Ms. Baker who is actually handling the case,
 7   has actually had some plea discussions.  We're still working
 8   through and are hopeful that on May 21st we'll have advanced the
 9   ball and will be able to make some representations to the Court.
10         THE COURT:  That's fine.  Ms. Itoh.
11         MR. ITOH:  That's correct, Your Honor.
12         THE COURT:  All right.  So you're doing okay, Mr. Harris?
13         THE DEFENDANT:  Yes, sir.
14         THE COURT:  All right.  That's good.  So, let's focus on
15   the -- let me hear from the -- Mr. Saindon is here.  I see.
16   Ms. Amato out there from the Department of Corrections.  General
17   counsel, good morning.  Mr. Booth is not here.
18         MR. SAINDON:  That's correct, Your Honor.  Mr. Booth is at
19   Georgetown attending a graduation for --
20         THE COURT:  You know, that's important.  I wish he had
21   been here.  I would have been happy to continue this matter.  The
22   Empowerment -- is that one of the Empowerment graduations?
23         MR. SAINDON:  Yes, Your Honor.  It's a program for the
24   inmates.
25         THE COURT:  That's extremely important, but I wanted him
```

1    here to hear what I have to say.

2        MR. SAINDON:  We'll be sure to convey it in as much detail

3    as we can, Your Honor.

4        THE COURT:  All right.  But I would have been delighted to

5    change that date and not conflict with that graduation ceremony.

6    I know how -- having attended at least one Empowerment session at

7    the jail and interacting with some very talented and gifted young

8    men, I know how important that is, but all right.  It's a lost

9    opportunity for him, because what I have to say is very

10   important.  So you're representing the Department of Corrections?

11       MR. SAINDON:  Yes, Your Honor.

12       THE COURT:  Let me do this for a second.  Let me invite

13   you to have a seat.  I want to kind of put this case in

14   perspective, put this issue in perspective, and then I want to

15   hear from you, Counsel, and anyone else who wishes to be heard.

16       So, in 1998 a man pled guilty to first degree murder

17   before me.  His name is Leo Gonzalez Wright, and he had been

18   charged with kidnapping a Georgetown law school student, Bettina

19   Pruckmayer, and some things you never forget.  It was a

20   horrendous -- it was a horrific crime.  She was kidnapped.  She

21   turned over her PIN information for automatic withdrawal, there

22   were a few dollars in her account, and she was thereafter

23   murdered.  Mr. Wright had previously served 20 years in a federal

24   facility for the offense of murder.  He pled guilty to life

25   without parole, and he was sentenced -- he was sentenced and

1    committed to the Bureau of Prisons, and no one thought there

2    would be any problems with that.  And then a few weeks later, I

3    actually was in chambers and did something I don't like doing,

4    answered the phone after 7:00.  Nothing ever goes right after

5    that when you answer the phone, and it was Mr. Pruckmayer on the

6    phone.  And I was surprised to hear him.  He was very upset.

7    Still to this date, I do not know how he got the information that

8    he had, but he told me, he said, "Judge, Leo Gonzalez Wright is

9    still at Lorton -- I think Lorton was open then; I think Lorton

10   Reformatory -- and he was very upset, and he said he had

11   information that Mr. Wright had actually been furloughed to

12   attend the death of his own mother, which was pretty shocking,

13   especially since he had been committed to the Bureau of Prisons

14   by the Court, and I scheduled a hearing.  And my recollection is

15   Mr. Pruckmayer was there.  I didn't put anymore pressure on him.

16   It was a hearing for the purpose of the Department of Corrections

17   trying to address what had happened.

18        As a result of that hearing, the Court took some rather

19   unprecedented action.  It directed the then Attorney General

20   Janet Reno to investigate the handling of the Leo Gonzalez Wright

21   sentencing and what went wrong, and also to report to the Court

22   about issues the Court had learned about other offenders who were

23   sentenced, and there were a myriad of problems associated with

24   those sentencings as well.

25        Attorney General Reno appointed a man whose name was John

1    Clark -- I don't know if Mr. Clark is here today; I know he has

2    notice of this hearing -- as a trustee to conduct an appropriate

3    investigation into those issues, and he issued a report.  It's

4    amazing how time flies.  It seems like only yesterday.  He issued

5    a report dated October 5th, 1999.  I'm not going to go through

6    it.  It's on-line.  It's probably under the category of Report to

7    the Attorney General, Review of the handling of Leo Gonzalez

8    Wright and Similar Offenders Sentenced by the U.S. District Court

9    in the District of Columbia.  And there were a lot of problems

10   associated with what we call dual sentencings, individuals who

11   have obligations as a result of Superior Court judge sentencings

12   and then District Court sentencings, and we recognized there were

13   a number of problems that were occurring, and essentially the

14   Department of Corrections was in a mess, is the bottom line.

15        One of the results of that investigation -- Well, first of

16   all, Mr. Clark identified a number of problems, and he also

17   recommended that there should be a committee that has some

18   oversight responsibility.  So, for the past 19 years there's been

19   a committee.

20        Under the radar screen committee, court committee, I've

21   been associated with that committee and on that committee and

22   either chairing that committee or on it for the past 19 years,

23   and it consists of, essentially, all the players in the law

24   enforcement system, prosecutors, Federal Public Defenders,

25   attorneys from Public Defender Service, Bureau of Prisons

```
 1    personnel, Marshal Service, U.S. District Court, Marshal Service
 2    Superior Court, CSOSA, pretrial, Attorney General's Office -- and
 3    I just recognize that Ms. Ludaway is present -- Chief Deputy
 4    Attorney General.  Good morning.  Good to see you --
 5              MS. LUDAWAY:  Good morning, Your Honor.
 6              THE COURT:  -- as well.  Ms. Ludaway is on the committee
 7    over the -- we've invited -- and indeed representatives from the
 8    Mayor's Office have participated recently when we had the air
 9    conditioning issues, and I'll talk a little bit about that later.
10    But I would like to say that over the 19 years, we've been
11    meeting once every other month, sometimes once a month at 8:30 in
12    the morning, no breakfast, no meals.  We had modest funds for
13    coffee for a while, but the funds ran out and they weren't
14    replenished, so if you want water, you bring it to the meeting.
15    But we've been able to accomplish a lot, and it really is -- it
16    really speaks volumes about the level of cooperation -- Oh, the
17    U.S. Attorney's Office.  I'm sure I left out someone, CSOSA,
18    pretrial, any player you can think of in the law enforcement
19    arena is present at that table and accounted for, sometimes
20    between 20 and 30, sometimes more people around the table.  And
21    we deal with issues, and with no fanfare, no headlines we resolve
22    a lot of issues, and I think it's a credit to all those players,
23    especially the Mayor's Office, the Department of Corrections, and
24    the Court, and we put a lot of pressure -- We had meetings like
25    every other day for a while to make sure that the air
```

1   conditioning, the cooling system at the jail was working properly

2   because -- it's unfortunate that people have to be incarcerated,

3   but they don't have to be -- they don't have to suffer

4   unconstitutional damages.  I'll leave it at that.

5        And, fortunately, we were able to deal with the air

6   conditioning issues over the past couple of years.  And while I

7   have everyone's attention, that's something we're going to be

8   taking a hard look at this spring because summer is rapidly

9   approaching.  There's some courts in this country that have held

10  that, you know, if a Department of Corrections cannot provide

11  modest cooling equipment, that could rise to the level of cruel

12  and unusual punishment, and in that -- you know, that's something

13  that the Department of Corrections wants to avoid because that

14  would breed lawsuits for damages and money out of the taxpayers'

15  pockets.

16       So, to their credit, I'm not aware of any lawsuits filed

17  in either Superior Court or District Court in the past couple of

18  years or so alleging or seeking compensation for damages for the

19  lack of appropriate cooling equipment at the Department of

20  Corrections.  We've had some other issues.  The Department of

21  Corrections likes to say that, "Uhhh, on occasion there are

22  problems with over-incarceration of people."  There's no such

23  thing as over-incarceration.  That over-incarceration costs the

24  taxpayers of this city $15 million in damages.  It's not

25  over-incarceration, it's illegal incarceration.  It's like when

1   you put something in an oven and cook it and it cooks too long.

2   It's not overcooked, it's burned.  And so people have to separate

3   fantasy from fact.  So that snafu cost the taxpayers $15 million,

4   maybe $15 million that could have remained with the Department of

5   Corrections to address other problems.

6          So I'm just giving a little historical outlay here.

7          And talk about things that I didn't do.  I've not asked

8   John Clark or anyone else to -- or the Attorney General or anyone

9   else to conduct an investigation.  I've not done that.  It's not

10  to say that I can't do it because I can.

11         And I've not issued -- it's important, very important --

12  I've not issued an order to show cause why my order detaining

13  Mr. Harris was not followed.  I haven't forgotten about that, but

14  I purposely did not do that because I wanted to have this status

15  hearing first to share some concerns and essentially draw a line

16  in the sand.  I'm the line.  I'm drawing that line now.

17         So, there are some options available that the Court has

18  not taken that the Court could take to resolve the current issue

19  of improper release of individuals.  This is not rocket science

20  stuff.  Everyone has a name.  Everyone has a DCDC number.  The

21  Department of Corrections has reported it has handled, I think,

22  50,000 inmates per year, I think -- is that correct, per year, I

23  think, Kristy, per year -- and has done so in a manner that has

24  not resulted in any erroneous releases, but what's many?  There

25  shouldn't be any.  There should be zero tolerance.  If a person

1   has a name and a number and the Department of Corrections gets an

2   order and a Form 41 from the Marshal Service saying this person

3   can be released or cannot be released, it's not rocket science to

4   make sure that people aren't released.  And what happens if

5   people are released?  Well, we know of the horror stories of what

6   could happen.  Suppose another crime was committed.  Suppose

7   someone was hurt or worse.  Suppose a marshal has to go out and

8   try to find someone and that marshal is hurt or worse.  Then

9   there's another suit for damages for money that's going to come

10  out of the taxpayers' pocket.

11       This is a significant public safety issue that the city

12  through its Department of Corrections needs to resolve.  There's

13  just no excuse.  There has to be zero tolerance.  Nothing less

14  than that will be acceptable.

15       Now, I may put on the back burner the order to show cause.

16  I have up to this point, and I plan to do so.  I may have put on

17  the back burner appointing someone to do another 125-page report.

18  I'm going to put that on the back burner.  I have no desire to

19  run the Department of Corrections, but I can and I will if

20  necessary, because this is about public safety, and these

21  erroneous releases can't continue to happen.

22       Now, I think I've put it in perspective, and the committee

23  has been, you know, been addressing this.  And I know I'm putting

24  a lot of things on the public record, but the public needs to

25  know that, you know, the Court's been aware of this, aware of

1    these snafus, and to their credit the Marshal Service and the

2    Department of Corrections have had a number of meetings,

3    informative meetings, I understand, in which progress has been

4    made to eliminate, not to address it, but to eliminate this

5    problem of erroneous releases from D.O.C., the Department of

6    Corrections, but they still occur.

7         So, when Mr. Harris was released, Mr. Harris is on my

8    calendar.  Then I said, you know, enough is enough, I need to

9    issue an order just for the purpose of explaining what's

10   happened.  I have the response, but more will be required than

11   what's contained in that response.  But that's just the first

12   step.  I have no desire to take the additional steps, but I will

13   and I can.  I think I've said enough to put the issue in

14   perspective.  My colleagues are -- let me choose my words

15   correctly -- upset, extremely upset.  There are other words to

16   explain what they think about this, because they call me because

17   I'm on this committee, and they say, What the heck is going on,

18   Emmet?  So I have to deal with my colleagues, too.

19        Now, that's not to say that I'm the only judge considering

20   action.  There may be other of my colleagues.  We're all

21   independent.  We're all appointed for life.  I'd like to think

22   that I can report to them that hope springs eternal that this

23   problem is going to be resolved, not addressed.  There has to be

24   zero tolerance, and we need some assurances this is not going to

25   happen again.  The public needs some assurances.  I don't think I

1    need to say anything more at this point, but I'll hear from the

2    attorney from the Office of Attorney General.  Good to see you.

3    I haven't seen you in years, I don't think.  Sorry it's under

4    these circumstances, but you get the drift.

5            MR. SAINDON:  I do, Your Honor.

6            THE COURT:  It's got to get resolved.

7            MR. SAINDON:  Thank you.  Andrew Saindon on behalf of the

8    Department of Corrections.

9            The Department of Corrections takes full responsibility

10   for the erroneous release of Mr. Harris.  Period.

11           THE COURT:  And there's some others that we're not going

12   to talk about but there are some others, and it happens with some

13   regularity that -- it just -- it's just impossible to comprehend

14   why it's happening.

15           MR. SAINDON:  I understand, Your Honor.  Again, we're not

16   here to make excuses.  We explained what happened in Mr. Harris's

17   case.  We're taking concrete steps to fix the problem.  As you

18   said, we've had a number of helpful operational meetings since

19   last summer, and since just before this incident there have been

20   a number of high level meetings involving the Deputy Mayor,

21   Ms. Ludaway, Mr. Booth, and representatives from the U.S.

22   Marshals Service.

23           THE COURT:  And I'm really sorry that Mr. Booth -- I'll

24   say it for the last time.  He should have been here.  I would

25   have been delighted to continue this.  He needs to hear what I

1    just said.  Reading a transcript and hearing it filtered through

2    someone else is not the same.  I have a high regard for him.  I

3    think he's doing some good things over there, especially with

4    that Empowerment program, but he should have been here.

5          MR. SAINDON:  Yes, Your Honor, and I'm sorry that he

6    wasn't.  As I was saying, the high level meetings, there was

7    another meeting this morning at 10:00 here at the courthouse, the

8    U.S. Marshals Office along with Ms. Ludaway, Mr. Donahue, and

9    representatives from the U.S. Marshals Service.  You've got our

10   attention.

11         THE COURT:  And Mr. Donahue is the Deputy --

12         MR. SAINDON:  -- Deputy Mayor for public safety, Your

13   Honor, yes.

14         THE COURT:  And he was very much involved in the cooling

15   issue, very much involved.  We were having meetings, I think,

16   every other day for a while because we wanted -- Again, we wanted

17   to get people's attention that -- and we were visiting the jail

18   as well.  And while we're talking about cooling, I don't want to

19   get sidetracked with that.  The Department of Corrections can

20   expect some popup visits by myself and my colleagues and not

21   announced.  We're going to do it to make sure that cooling is

22   what it should be.

23         MR. SAINDON:  Understood, Your Honor.  That's okay.

24   Again, we explained what happened in detail in Mr. Harris's case

25   here, and we're taking concrete steps to fix it.  Hiring more

1    people.  We're going to hire an expert to come in and study it

2    objectively, the release problem, and we're continuing to work

3    with the Marshals Service.

4        THE COURT:  And this is a person who has experience in the

5    corrections field?

6        MR. SAINDON:  That's the idea, yes.  We have identified

7    somebody, yes, Your Honor, but we will hire an expert with

8    expertise in the release process.

9        THE COURT:  Okay.  That person has not been hired, though,

10   yet, right?

11       MR. SAINDON:  That's correct, Your Honor.  We're still

12   looking at candidates.  And again, it's -- our goal is the same

13   of your goal:  Fix the problem.

14       THE COURT:  Anything else?

15       MR. SAINDON:  That's what I have, Your Honor.  Again, I'm

16   not here to offer excuses.  We apologize for the incident and

17   we're going to --

18       THE COURT:  Well, it's the public that needs the apology.

19   I mean, we can handle matters in the court, but this can't

20   continue.

21       MR. SAINDON:  Agreed, Your Honor.  Every erroneous release

22   has the potential for great harm.

23       THE COURT:  Absolutely, and we're just very fortunate that

24   there has not been great harm --

25       MR. SAINDON:  -- that's correct --

1    THE COURT:  -- either to Mr. Harris or to one of the

2    marshals or to a member of the public, and I think it's just --

3    Unfortunately, those things happen.  It's probably just a matter

4    of time before something like that happens.  I don't know that to

5    be a fact, and hopefully it won't be a fact, but at some point

6    the law of averages kicks in, too.  We've been very fortunate

7    that there has not been anyone hurt.

8        When do you think that the Department of Corrections will

9    hire the expert or consultant?

10       MR. SAINDON:  Probably within the next week or so.

11       THE COURT:  Really?

12       MR. SAINDON:  But we're on a fast track, Your Honor, yes.

13       THE COURT:  Here's what I'm thinking about doing.  And

14   again, I'm just saying, I'm not availing myself of those other

15   options at this point and really have no desire in doing that

16   because I think that the committee that oversees a lot of these

17   activities can be very helpful.  I think the city can be helpful.

18   It may require spending more money.  I don't know.  It may

19   require more levels of review of decisions to release people

20   before that final decision is made to release someone.  I just

21   don't know, but it can't be rocket -- it can't be that difficult.

22   Is it?  Am I overlooking something?  Is it that difficult?

23       MR. SAINDON:  I don't think you are, Your Honor.

24       THE COURT:  All right.  Here's what I'm inclined to do:

25   To post an order to require a status report in 30 days to update

 1    the Court on the status of remedial actions taken, including but

 2    not necessarily limited to -- and this will all be in the

 3    order -- one, whether there have been any additional erroneous

 4    releases since the May 8th, 2018 filing; two, if there has been

 5    an erroneous release, an explanation of the circumstances

 6    surrounding the erroneous release; three, the status of hiring

 7    additional records office staff; and four, the status of hiring

 8    an independent consultant to study and make recommendations on

 9    improving records office operations and procedures.

10         And I guess I would add to that a fifth one, a commitment

11    from the city that adequate financial resources will be provided

12    to the Department of Corrections, because you can have all the

13    brilliant recommendations in the world, but if you aren't getting

14    the money from the city, the agency can't get funded properly.

15    Is that an issue, funding?

16         MR. SAINDON:  Not that I know of, Your Honor.  It's just a

17    matter of, again, moving funds around.

18         THE COURT:  Right.  Right.  I'm thinking of requiring that

19    status report to be filed in about 30 days.  Today's date is

20    what, the 11th?  June the 11th.  And maybe a status -- let me

21    share a thought with counsel.  What makes more sense, a status

22    report in 30 days and a status hearing a week or two after or

23    maybe a status report July the 11th and a -- why don't I give the

24    city more time, July the 11th, and then a status hearing in court

25    on a date that's convenient, and I have to defer to -- excuse me

1    one second.

2          MR. SAINDON:  Certainly, Your Honor.

3          (Brief pause in proceedings.)

4          THE COURT:  How about July 31st at noon?  Is that a bad

5    date for anyone?

6          MR. SAINDON:  That's fine.

7          THE COURT:  And I would like Mr. Booth to be here at that

8    time.

9          MR. SAINDON:  When would the hearing --

10         THE COURT:  Probably at noon, 12 p.m.

11         MR. SAINDON:  The report before then, Your Honor?  I'm

12   sorry.  We're certainly moving fast, Your Honor.  If Your Honor

13   would like it in 30 days, we can do it in 30 days.

14         THE COURT:  Okay.  How about an initial 30-day report June

15   11th, another report July 11th, and then the status hearing July

16   31st?

17         MR. SAINDON:  We'll do that, Your Honor.

18         THE COURT:  I may have a -- do we have an audio of my

19   comments?  You can play those comments for Mr. Booth.  I don't

20   know.  You have to promise me you'll emphasize what I said.

21         MR. SAINDON:  Absolutely, Your Honor.

22         THE COURT:  I'm happy to -- If you have questions,

23   Counsel, I'm happy to address any -- it's not an adversarial

24   proceeding as such.  The Federal Public Defender is here quiet

25   and the federal prosecutor is here quiet, and that's actually a

1  luxury for me because no one's talking but me, but do you have

2  any questions that you would like to raise?  I don't think I

3  have -- one other thing.  What I'll probably do is also require

4  at least quarterly reporting on these issues thereafter.

5       MR. SAINDON:  I have no further questions, Your Honor.

6  Thank you.  I think you've been very clear.

7       THE COURT:  All right.  Okay.  Let me just check with my

8  staff.

9       (Brief pause in proceedings.)

10      THE COURT:  Counsel, I don't have anything else, but I

11 really want Mr. Booth here present for the next hearing and any

12 other supervisors in that area of records, management.  I mean,

13 that's the key, I think.  But then I'm just making those

14 assumptions as an outsider.  But it just strikes me there are

15 some levels of review that are lacking somewhere, and someone has

16 to have the final authority 24/7 to say this person should not be

17 released or this person should be released and the U.S. Marshal

18 Service agrees.  There has to be that person on duty 24/7, I

19 think.  But, again, that's just as an outsider.  I don't want to

20 go down this million mile journey, I really don't.  There's a ton

21 of talent.  I could ask Mr. Clark -- appoint him -- to do another

22 report.  I don't want to do it, I just want the problem fixed.

23 All of us owe that to the public.  All right.

24      MR. SAINDON:  Understood, Your Honor.

25      THE COURT:  But if you have any questions, I'm happy to

1   answer those questions.

2        MR. SAINDON:  I appreciate that, Your Honor.  I do not at

3   this time.

4        THE COURT:  All right.  I think there's a

5   representative -- is it Mr. Brown?

6        (Brief pause in proceedings.)

7        THE COURT:  All right.  I know that counsel person Alan --

8   his office had contacted us and someone wanted to attend.  I'm

9   actually going to invite a staffer from his office to join the

10  informal committee that works constantly with these issues.  I

11  mean, we have someone from the Mayor's Office.  We should have

12  someone from the City Council Person's Office who presides over

13  matters of public safety, I think, so I'm going to invite someone

14  from council member Alan's staff to join us as well.

15       Your office is well represented by Ms. Ludaway and her

16  deputies, and I see all the brilliance out there today, and I'm

17  sure they'll help resolve this and identify someone who can fix

18  this problem, all right.  Sooner rather than later, all right.

19  Thank you, All.

20       MR. SAINDON:  Yes, sir.  Thank you, Your Honor.

21       THE COURT:  And Ms. Ludaway, I know you're not in the well

22  of the court, but any questions or anything that you would like

23  to say?

24       MS. LUDAWAY:  No, Your Honor.  Thank you.

25       THE COURT:  Let me thank everyone for coming over on such

1    short notice.  But I really want Mr. Booth present at the next

2    hearing.

3         MR. SAINDON:  Yes, sir.

4         THE COURT:  And if he's going to be out of the country on

5    vacation, let me know, I'll change the date, but I want him here.

6         MR. SAINDON:  Will do.  Thank you, Your Honor.

7         THE COURT:  Alright.  Thank you, All.  Ms. Itoh, Mr.

8    Scarpelli, thank you.  You guys have been quiet today.  Anything

9    that you want to say?  And I should have mentioned the U.S.

10   Attorney's Office is very instrumental with that informal group.

11   Mr. Crabb, I think, is the representative, so we appreciate the

12   hard work of everyone.  We just have to fix this problem, sooner

13   than later, though, before it happens again.  Thank you.

14        Did you have something you want to say?

15        MR. ITOH:  Just briefly, Your Honor.  I wanted to confirm

16   the date for the hearing.  I'm out of town on July 31st, but I

17   could attend the previous week.  I don't know if we had actually

18   set a date.

19        THE COURT:  Could you have someone stand in for you on

20   July 31st, because we're not going to talk about, I don't

21   think -- we're not going to talk about the merits of Mr. Harris's

22   case.  And, in fact, do we need Mr. Harris here?  He certainly

23   has a right to be present.

24        MR. ITOH:  I would be happy to have someone stand in, Your

25   Honor.

1    THE COURT:  All right.  Why don't you do that.  We're not

2  going to talk about the merits of the case.  On the 21st we're

3  either going to talk about a potential trial date or whether it's

4  a resolution, but if he's going to be here, I definitely want him

5  represented, but we're not going to inquire about the merits.

6    MR. ITOH:  I will have someone stand in.

7    THE COURT:  I note that our U.S. Marshal is present, and

8  if there are questions you would like me to raise also -- I don't

9  want to overlook you -- if there's something I've overlooked that

10  I should mention, please tell me.

11    MS. AMATO:  Thank you, Your Honor.  I think you have it

12  covered everything.

13    THE COURT:  Thank you.

14    MR. ITOH:  And just briefly, Your Honor.  I understand

15  that Mr. Harris, for practical purposes, was in custody this

16  entire time.  There was a detainer for his case in Maryland, so

17  he actually was in custody, so we just ask that for sentence

18  computation purposes, if that does come into play, that he would

19  get credit for the entire time.

20    THE COURT:  Okay.  I can't make that decision.  Of course,

21  whenever I -- when it comes down to potential sentencing, what I

22  normally do is say that a person sentenced should be entitled to

23  receive any and all credit that he or she is entitled to, because

24  that requires an expertise beyond my ability to determine credit

25  for what days, et cetera.  So I leave it up to BOP, and it may

1   well be that you and Mr. Scarpelli can reach an agreement that

2   will bind the federal government.  I don't know.  It's a tricky

3   situation.  I understand what you're saying, and that really is a

4   very interesting issue, whether or not someone who had been

5   authorized for release should be denied credit.  I don't have to

6   resolve that today, thank goodness, but I'll probably leave that

7   to the Bureau of Prisons.  But I encourage you to speak to

8   Mr. Scarpelli and maybe you and the probation officer and

9   Mr. Scarpelli can come up with a recommendation.  I don't know.

10  But that's a very interesting issue.

11        MR. ITOH:  I will, Your Honor.

12        THE COURT:  Thank you.  Thank you.  Mr. Harris, you take

13  care of yourself, all right.

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  And we'll talk again.  Actually, we'll talk

16  again on May 21st.

17        THE DEFENDANT:  Sure.

18        THE COURT:  All right.  Okay.  Thank you, All.

19        (Proceedings adjourned at 11:55 a.m.)

20                      **C E R T I F I C A T E**

21

22              I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
23        proceedings in the above-entitled matter.

24        /s/ Scott L. Wallace                 5/18/18
          ---------------------------       ----------------
25        **Scott L. Wallace, RDR, CRR**           **Date**
             **Official Court Reporter**