**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case. No. 18-CR-28 (EGS)** |
| ) | |
| **JARRELL HARRIS,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

## SENTENCING MEMORANDUM

On July 13, 2018, Mr. Jarrell Harris, through counsel, entered a plea of guilty to escape from custody in violation of 18 U.S.C. § 751(a), unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and fleeing a law enforcement officer in violation of 50 D.C.C. §2201.05b(b)(2).   He will appear before this Honorable Court for sentencing on September 27, 2018.   For the reasons that follow, Mr. Harris respectfully requests that the Court impose a sentence of one year and one day, to be followed by a term of supervised release, ███████ ████████████████████████████████████████████████████   Mr. Harris also requests that the Court adopt the parties' recommended guidelines range of 18 to 24 months for Counts One and Two, and consistent with the guidelines, impose the sentence for the federal offenses (Counts One and Two) concurrently with his sentence for the D.C. Code Offense (Count Four).

## Factual Background

Mr. Harris is now 24 years old.   He was born and raised in Washington D.C. ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

1



[redacted]

As an adolescent, Mr. Harris gravitated more and more toward his peers from the area where he lived, none of whom were a good influence. *See* PSR ¶ 77 (describing the part of Southeast Washington D.C. where Mr. Harris grew up as being in "close proximity to a neighborhood with a high crime rate.") [redacted] determined to prove himself as a "man," Mr. Harris was easily influenced by his peers. As a result, Mr. Harris began imitating the bad behavior he saw all around him. He struggled in school, and withdrew from high school after completing the eleventh grade. He was

convicted of unlawful possession of a firearm at age 18, and assault with a dangerous weapon at age 20.

Also in 2015, Mr. Harris was the victim of an attempted robbery during which he was shot in the leg. *See* PSR ¶ 80. He was hospitalized for five days, and suffered from anxiety and panic attacks related to the trauma he experienced during the incident. *See id.* ¶ 82.

Mr. Harris has two children, ages six and four, who live with their mother, Cynthia Payne. Mr. Harris and Ms. Payne were in a relationship for four years, but they separated due to her infidelity and his incarceration. Mr. Harris loves and cares very much about his children, and is distressed over the fact that Ms. Payne has made it difficult for him to see them and have contact with them. Upon his release, Mr. Harris is eager to resume his relationship with his children.

Despite growing up under challenging circumstances, Mr. Harris worked hard as an amateur and professional boxer. Ten years ago, Mr. Harris started training at a boxing gym run by Anthony E. Bell, Sr. a retired Metropolitan Police Department Officer. Mr. Harris has participated in 112 amateur tournaments as well as professional tournaments in Washington D.C., North Carolina, and West Virginia. In recognition of Mr. Harris's talent, hard work, and commitment to pursuing his dream of becoming a professional boxer, Mr. Bell has agreed to serve as Mr. Harris's manager and has written in support of Mr. Harris. *See* Letters of Support (attached as Exhibit A). Mr. Harris is eager to begin training as soon as he is released from custody. He prays that he is not sentenced to such a lengthy term of incarceration that he would be unable to achieve his dream, due to aging out of his prime athletic years.

## Argument

### I.     Objection to the PSR's Calculation of Mr. Harris's Guidelines Range; the Correct Guidelines Range for Counts One and Two is 18-24 Months

The parties disagree with the Probation Office's calculation of Mr. Harris's guidelines range based on counting Mr. Harris's prior conviction for Assault with a Dangerous Weapon (ADW) as a crime of violence.   As noted in the plea agreement, Mr. Harris's base offense level for Count One should be 14, instead of 20 (as indicated in the PSR).   His final offense level for Counts One and Two after grouping and adjustments for acceptance of responsibility should be 13, instead of 18 (as indicated in the PSR).   His estimated guidelines range for Counts One and Two is therefore 18 to 24 months, instead of 33 to 41 months (as indicated in the PSR).

Here, the government has asked the Court to apply the guidelines range of 18-24 months for Counts One and Two, which *does not* count the prior ADW conviction as a crime of violence. Gov't Mem. in Aid of Sentencing, ECF No. 30 at 3-4.   Where, as here, the government is *not seeking* a sentencing enhancement, and yet Circuit case law holds that the government *bears the burden* of proving that enhancement, the Court should find that the burden was not met and decline to apply the enhancement. *See, e.g.*, *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (holding that the government bears the burden of demonstrating that a sentencing enhancement is warranted).

Applying the enhancement would also be inconsistent with the agreement between the parties as embodied in the plea agreement.   To support its conclusion that ADW is a crime of violence, Probation relied on *United States v. Haight*, 892 F.3d 1271 (D.C. Cir. 2018), which was issued on June 22, 2018, just five days before the current version of the plea agreement was sent to defense counsel.   As the government noted in its sentencing memorandum, the parties "had

4

many discussions over a period of weeks regarding the plea agreement in this case" and the *Haight* decision was "not part of the previously on-going plea discussions."   Gov't Mem. at 3.

II.     **The 3553(a) Factors Support the Requested Sentence of Twelve Months and a Day**

When imposing a sentence, the Court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).   In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.   *See* 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582.   With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."   18 U.S.C. 3553(a) (emphasis added).

(1)     **The Guidelines Range is 18 to 24 months For the Federal Charges and 14 to 32 months for the D.C. Code Offense, to Run Concurrently**

As noted above, the recommended sentencing range as agreed-upon by the parties is 18 to

24 months for the federal charges (Counts One and Two), and 14 to 32 months for the D.C. Code offense (Count Four).  As noted in the PSR, the guidelines provide that the sentences for the federal charges (Counts One and Two) and the D.C. Code offense (Count Four) shall run concurrently.  PSR ¶ 102a; 104a.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it.  *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).  Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors."  *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

### (2)    The Guidelines Overstate Mr. Harris's Criminal History Category

Although Mr. Harris does not dispute the PSR's calculation of his criminal history category, he submits that a variance from the guidelines range is warranted in part because the Guidelines overstate his criminal history.   Mr. Harris is in criminal history category III as a result

of five criminal history points, which all arise from a single prior conviction of Assault with a Dangerous Weapon.   He received three criminal history points for the conviction, and two additional criminal history points under § 4A1.1(d) because he was under a criminal justice sentence when he committed instant offenses.   The Commission's rationale to punish individuals who commit an offense while under a criminal justice sentence does not apply to escape cases, where being under a criminal justice sentence is not an aggravating factor, but rather, a necessary element of the offense.   Much like the 2-point enhancement for "use of a computer" that is often discounted in child pornography cases (because courts have viewed using a computer as a necessity in committing the offense, rather than an aggravating factor), this form of double-counting inflates the advisory sentence without justification.

If not for the additional two points, Mr. Harris would have 3 instead of 5 criminal history points, he would be in criminal history category II instead of III, and his guidelines range for Counts One and Two would be 15 to 21 months instead of 18 to 24 months.[1]   Although Mr. Harris is not requesting a downward departure for this or any other reason, this is an important factor for the Court's consideration in determining the appropriate sentence.   In the event that the Court disagrees with the parties and counts the ADW conviction as a crime of violence, then this *single* conviction would result in a gross inflation of Mr. Harris's guidelines range.   In addition to accounting for *five* criminal history points, counting the ADW conviction as a crime of violence

---

[1] Undersigned counsel understands that Judge Ketanji B. Jackson and Judge John D. Bates recently subtracted two points for defendants' criminal history calculations in Escape cases based on this double-counting.  *See United States v. Delonta Johnson*, No. 18-cr-159 (KBJ).  *United States v. Antione Gibson*, No. 18-cr-154 (JDB).

would result in an offense level that is *five levels higher* for the federal offenses (Counts One and Two).

### (3)   The Nature and Circumstances of the Offense.

Mr. Harris recognizes the gravity and seriousness of the instant offense.  He left Hope Village without authorization.   While on escape, he unlawfully possessed a firearm, and he fled from the police.   Mr. Harris does not wish to minimize his conduct and makes no excuses for it. He realizes that he has no one to blame but himself.

While it does not excuse his conduct, it is worth noting that there have been serious, documented problems at Hope Village.  Far from being a safe, positive environment that fulfils its purpose of helping returning citizens to reacclimate to life in the community, Hope Village is a notoriously dangerous place where drug use, shootings, and violent crime—even murder—have been known to occur, even on the premises.   Thus, although inmates are sent to Hope Village with little time remaining on their sentences, in the last seven months alone, *at least* fifteen percent of the residents chose to walk away, rather than complete their short sentences at Hope Village.[2]

### (4)   Mr. Harris's History and Characteristics Weigh In Favor of a Downward Variance

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[2] Hope Village is only a 300-bed facility.   *See* https://www.bop.gov/locations/rrc/index.jsp?contract=15BRRC18D00000081 (last visited Sept. 9, 2018).   Yet, in the last seven months alone, the government has charged at least 45 defendants with escaping from Hope Village – and the government has not charged every defendant who failed to return as required or walked away without permission.



At the age of 20, Mr. Harris became involved in the offense for which he was serving his sentence when the instant offense occurred.   Mr. Harris deeply regrets that offense.   While Mr. Harris is no longer technically a child or a teenager, having spent the last four years in prison he has not had the opportunity to mature and become a responsible adult in the way one would in the outside world.   Mr. Harris's time in prison was devoid of positive influences and role models.

While the law deems children "adults" at the age of 18, even children who are raised by two parents in a nurturing environment do not magically turn into mature adults on their eighteenth birthday.   Indeed, as the Supreme Court noted in *Thompson v. Oklahoma*, young offenders such as Mr. Harris should be treated by the law as less culpable than adults:

> Crimes committed by youths may be just as harmful to victims as those committed
> by older persons, but they deserve less punishment because adolescents may have

less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.

487 U.S. 815, 834-35 (1988) (plurality opinion).   *See also Roper v. Simmons*, 543 U.S. 551, 569-70 (2005) ("Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.").   This consideration is especially applicable to Mr. Harris, who did not have a childhood that facilitated his growth into a responsible adult.

████████████████████

## **Conclusion**

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Harris respectfully requests that the Court impose a sentence of one year and one day, to be followed by a term of supervised release.█████████████████████████

████████████████████

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Loui Itoh
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

11