

THE MOSS GROUP, INC.
*Experienced Practitioners Committed to Excellence in Correctional Practice*

# DC DOC Inmate Detention and Release Process Analysis

*Final Report*
*October 2018*



Copyright © 2018 The Moss Group, Inc.

*Funded by Order No: PO584387*

# Table of Contents

Acknowledgments ................................................................................................................ 3

Project Purpose and Background ........................................................................................ 4

Synopsis of DC DOC Departments and Programs Relevant to Inmate Release Procedures ..... 6

    DOC Inmate Records Office ........................................................................................... 6

    District of Columbia Superior Court – Courthouse Release Program ......................... 9

    DC DOC Internal Stakeholders ..................................................................................... 10

Untimely and Erroneous Release Report Review ............................................................. 11

Comprehensive Understanding of the DC Criminal Justice System ................................ 14

    Federal Bureau of Prisons ............................................................................................. 14

    United States District Court for the District of Columbia ......................................... 14

    United States Marshals Service for the District of Columbia ..................................... 15

    United States Marshals Service, District of Columbia Superior Court ...................... 16

    United States Marshals Service, District of Maryland ................................................ 18

    United States Parole Commission ................................................................................ 20

Comparative Analysis ......................................................................................................... 20

    Davidson County Sheriff's Office (DCSO), Hill Detention Center ............................ 21

    Philadelphia Curran-Fromhold Correctional Facility ................................................ 22

    Montgomery County Department of Correction and Rehabilitation ........................ 24

DC DOC and Relevant Stakeholder Recommendations .................................................. 26

    DC DOC and the Inmate Records Office Recommendations .................................... 26

    DC DOC and IRO Stakeholder Recommendations .................................................... 34

Appendix A: DC DOC Document Request List ................................................................. 37

Appendix B: TMG Team Biographies ................................................................................ 38

# Acknowledgments

This project and its deliverables were produced by The Moss Group, Inc. (TMG), in partnership with the District of Columbia Department of Corrections (DC DOC), under purchase order # PO584387.

TMG would like to thank all of those who contributed to and supported the work of this project, especially the leadership of the DC DOC and the Central Detention Facility, staff from the Inmate Records Office, Inmate Reception Center, and throughout the facility and department. The openness, candor, and commitment to best practices contributed to the overall success of this project and its ensuing recommendations for enhancement.

Throughout this project, the TMG team has been impressed and appreciative of the level of support and demonstrated willingness by the DC DOC to enhance the operations of its Inmate Records Office to ensure the timely release of inmates.

Further, TMG wishes to acknowledge the support shown to the DC DOC by its local agency stakeholders, such as the U.S. Marshal's Service, United States District Court, District of Columbia Superior Court, Bureau of Prisons, the United States Parole Commission, and more. The TMG team was met with professionalism and an expressed desire for collaboration and improved systems for the processes involved with the detention and release of inmates housed within DC DOC.

_____

Copyright © 2018
The Moss Group
1312 Pennsylvania Avenue, SE
Washington, DC 20003

# Project Purpose and Background

Following the erroneous release of an inmate in April 2018, the DC Department of Corrections (DOC) decided to hire an independent consultant to assess and provide recommendations to improve the Inmate Records Office (IRO) operations and procedures. The DOC contracted with The Moss Group, Inc. (TMG), a criminal justice consulting firm, to conduct the comprehensive analysis of DOC documentation and processing related to inmate release, coordination with agencies and release authorities, and the IRO.  Though this contract, TMG sought to identify root causes of over detention and early releases and provide recommendations to improve detention and release process fidelity and to prevent future errors.

## Influencing Factors

### Volume
The DOC operates two correctional facilities—Central Detention Facility (CDF) and Correctional Treatment Facility (CTF)—and the Central Cell Block.  The CDF and CTF house approximately 2,100 inmates daily. Each year, the DOC processes approximately 12,000 intakes and 12,000 releases, with a median length of stay of 25 days for males and 11 days for females.  Approximately 2,500 federal inmates are incarcerated and removed from DOC's custody annually.  DOC's IRO staff processes over 50,000 transactions annually.  These transactions include over 150 distinct transaction types, such as commitment documents, release documents, jail credits, good time credits, designation documents, sentencing documents, court orders, writs, holds, USMS movement orders, and Parole Notice of Action Forms.

### Complexity
The DOC operates in a unique and complex criminal justice system that is partially federal and partially local, which requires coordination with multiple federal, state, district, and county agencies. This hybrid system is unlike any other criminal justice system in the country. DC criminal cases are processed through either the District of Columbia Superior Court (DCSC) or the United States District Court (USDC). DCSC is responsible for processing persons arrested for DC code offenses or misdemeanor United States Code offenses. USDC processes all felony US code offenses and a selection of misdemeanor offenses.

Ensuring inmates are released in a timely manner goes to the core of DOC's mission – ensuring public safety for the citizens of the District of Columbia. An early release from prison can put the community at risk while a late release deprives an inmate of their liberty. The transactions affecting release are complex and may require coordination with multiple agencies within a few hours of receipt of a release order.

### Litigation
The DOC has faced and settled two class action lawsuits regarding the over-detention and resulting strip searches of inmates.  In 2006, the District of Columbia reached a $12 million settlement agreement in Bynum v. District of Columbia (Civil Action No. 02-956 (RCL)).  Included in this $12 million settlement was a $3 million reversion specifically earmarked for the construction of an Inmate Reception Center designed to improve DOC's intake and release processing which opened in September 2014. The settlement agreement implemented provisions designed to remedy over-detention and related strip search issues at DOC. In the second related class action case, Barnes v. District of Columbia (Civil Action No. 06-315 (RCL)), DC settled the portion covering the period 2005-2007 for $6 million and litigated part of the case and prevailed on the portion covering 2008-2011.

# Methodology

The DOC and TMG contracted on May 30, 2018. TMG assembled a project team with subject matter experts (See Appendix C: *TMG Team Biographies*) to assess best practices in ensuring timely and error-free detention and releases, identify root causes of over detention and early releases, and provide recommendations to improve detention and release process fidelity and to prevent future errors. To complete this work the team collaborated with DC DOC to carry out the following tasks:

- A document request list (See Appendix B: *DC DOC Document Request List*) was provided to DOC for documents related to inmate releases, such as policy, manuals, release procedures, quality assurance protocols, release discrepancy reports, overall statistics, and erroneous or delayed release case file information. Throughout the project, DOC continued to provide documentation and reports related to ongoing untimely release cases.
- Interviews and observations with DC DOC staff, such as DOC leadership, IRO staff and leadership, receiving and discharge staff, housing unit supervision staff, general counsel, inmate court transportation unit staff, case managers, and the grievance officer.
- Interviews and meetings with stakeholder agencies, including USDC, DCSC, Federal Bureau of Prisons, USMS, United States Parole Commission, United States Attorney's Office, and Public Defender Services.
- Thorough review of IRO untimely release case files to evaluate current practices and identify contributing factors and causes for errors.
- An onsite comparative analysis with three jurisdictions to benchmark practices in detention and release processing.
- Thorough review and recommended revisions to finalize the Technical Resource Manual.

Information gathered through the above tasks has been synthesized into this report and organized in the following way:

- Applicable recommendations with content for the DC DOC IRO and for its work with local agency stakeholders.
- Synopsis of the IRO and its local departmental processes and programs.
- Summary of the review of untimely and erroneous release cases from DC DOC over the past 36 months.
- A comprehensive understanding of the partner agencies in which DC DOC collaborates with for inmate detention and release practices.
- Comparative analysis summary of release procedures from three local jurisdictions of comparable volume and complexity to DC DOC.

# Synopsis of DC DOC Departments and Programs Relevant to Inmate Release Procedures

## DOC Inmate Records Office

### Role
The staff in the IRO performs a vital function for DC DOC. They are the gatekeepers regarding who comes into the jail and who leaves the jail. The IRO staff plays an integral part in DOC's mission of ensuring public safety for the citizens of the District of Columbia. It is important to acknowledge the technical, challenging and time sensitive nature of the IRO's function. Sentence computation is the mathematical method of determining the various components of a sentence of imprisonment, e.g. length of sentence; the date the sentence begins, jail credit; parole eligibility; various good time credits; inoperative time and; release date. In addition to computing misdemeanor sentences, IRO staff process a significant number of cases in which individuals are arrested, detained and released after a short time in custody. They are required to complete a high volume of specialized, complicated work in a short period of time.

Collectively, the staff acknowledged there had been significant issues in the distant past with releasing inmates in a timely manner. Over the course of several years, the DOC improved its processes, its communications with external partners, and it introduced technological solutions to remedy problems with the paperwork process. The staff in the IRO recognize the importance of releasing inmates in a timely manner. They do not intend to keep an inmate incarcerated beyond their release date and recognize the human element involved in their work. Following the recent erroneous releases from USDC, a number of changes were implemented regarding additional checks for all releases, including Superior Court.

### IRO Staffing
There are two shifts that operate at the Central Detention Facility (CDF) five (5) days a week 7:30 a.m. 10:00 p.m. On Saturdays and holidays, one shift is on duty from 1:30 p.m. – 10:00 p.m. The satellite office at DCSC operates Monday through Friday, 10:00 am. – 6:30 p.m., excluding holidays. See *Figure 1* for the structure of each shift as indicated in the draft Technical Resource Manual

(TRM). IRO staff are in the process of creating a Technical Reference Manual (TRM) that will provide staff with additional guidance and assistance in performing the daily functions carried out by the IRO.

During this assessment, the IRO has a complement of 29 staff members. There is one correctional program administrator, four lead legal instrument examiners (LLIE), a quality assurance staff member, and legal instrument examiners (LIE). Recently, DOC has added two staff members to the IRO that had been assigned to other departments within DOC and added four additional external staff positions.



*Figure 1*

Of the 33 IRO staff members, 26 of them have more than eight years of experience in the office.

An LIE is stationed at DCSC and can receive, review, ███████████████████████████ ███████████████████████████████████████████████. The DOC has implemented a Courthouse Release program at DCSC for some misdemeanor offenders. From a quality assurance perspective, there has been an emphasis on formalizing procedures, conducting "mini-trainings," and collecting data. The development and implementation of the ████████████████████████ appears to have had the most positive impact on the operations of the IRO. Staff have thought deeply about continued process improvement for the IRO and finding sustainable solutions to the paperwork process problems.

### System Usage and Release Procedures
To process an inmate for release, a LIE will complete the procedures outlined below in *Figure 2*.



*Figure 2*

This is a laborious and circuitous process that also requires printing and placing documents in the institutional record and going in and out of several different systems. ████████████████████ ███████████████████████████████████, PDF scanner, ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ noted in Recommendation #4 will greatly improve this process.

### Phone Verification Process
In addition to the checklist, IRO supervisory staff are required to █████████████████████ ███████████████████████████ on every release.  The inmate cannot be released until the IRO staff have made contact with ██████████████████████ When implemented, this phone call verification was to be done on a trial basis. ████████████████████████████████████████ ████████████████████████████████ They confirm that the IRO staff have done the ████████████████████████████████████████████████ items on the checklist.

████████████████████████████████████████████████ ████████████████████████████████████████ The trial checklist requirement

of three signatures and the phone calls required for all releases reveals that the additional review has significantly slowed down the processing time for releases without significant added benefit. The DOC Inmate Processing and Release Amendment Act of 2012 requires that an inmate ordered release pursuant to a court order, the inmate shall be released within five hours of transfer from the custody of the Unites States Marshals Service into the custody of the Department of Corrections.

### *Legal Support for the IRO*

Currently, DOC's Office of General Counsel has two attorneys, including the General Counsel.  Staff in the IRO contact the General Counsel for legal advice on a myriad of issues that arise on a regular basis in the IRO, to include interpreting court orders, applying good conduct time credits, untimely releases, etc.  While the General Counsel is very capable of providing the advice and counsel to the IRO, she has so many other demands on her time, she would not be able to devote a significant portion of her time to the IRO.  In moving forward with changes in the IRO, the agency would be well served by adding an additional attorney in the Office of General Counsel who can legally assist the IRO with the transition and beyond.  Having an additional attorney available to assist the General Counsel in providing legal advice and legal sufficiency reviews on the agency's drafting of policy and manuals, developing and delivering training curriculum, developing quality assurance procedures, responding to inquiries and assisting counsel with the defense of litigation in this arena would greatly assist the IRO and mitigate risk for the DOC.

### *Quality Assurance Process in the IRO*

The DOC IRO has contracted with a Quality Assurance Auditor (QAA) who has extensive experience working in both the public and private sector providing services, such as performance improvement, business process reengineering, lean six sigma, business and technology requirements, evaluation, and solution selection and project and issue management.  The QAA's tenure with the DOC covers three different contracting periods beginning in September 2002 until present.  The QAA began working in the IRO in April 2012. Among the accomplishments the QAA noted  that appear to have had the most positive impact of the operation of the IRO include the following:

- Implemented a ████████ distribution ███████████████████ inmate transactions.
- Designed and implemented a ██████████████████ to capture, control, manage, and monitor workflow transactions.
- Clarified and documented IRO requirements for a new Offender Management System with integrated content management capabilities.

The following corrective action identified and implemented since January 2015, includes new tools and expanded processes, such as the release processing checklist, drafting the TRM, expansion of ████████, increased accountabilities for data quality, and ongoing validation of the USMS weekly roster. The QAA notes there are several improvements recommended, such as reliable and integrated systems, reduced reliance on paper-based processing, and increased automation for less reliance on manual processing.

The Quality Assurance audits describe the spot check audits and monthly random audits.  The spot check audits are done to identify errors that have recently occurred, so staff can be alerted to processing problems and improvements can be made to the U-Validate Inmate Data report to reduce the risk of continued errors of this type.  The results from these audits were encouraging. There were significantly fewer "failure to validate" errors due to dramatically increased management attention and improved tools (U-Validate Inmate Data).

The monthly audits are done to verify all the data contained in the institutional record (paper-based and electronic) is properly captured, coded, and filed in accordance with the established

procedures.  There were numerous processing problems observed during the monthly audits to include numerous "failure to validate" errors; missing information from both the paper-based and ███████ electronic images and notifications and other correspondence are frequently not scanned in ██████ and are sometimes missing the paper-based record. Overall, the audits demonstrated significant improvements in data quality and standardization, although additional improvements are needed.  There needs to be a continued focus on timely processing particularly for transactions that require additional signature verification.

## District of Columbia Superior Court – Courthouse Release Program

On July 7, 2008, the Superior Court of the District of Columbia (DCSC) began the Courthouse Release Pilot pursuant to Administrative Order No. 08-09. The Superior Court, in conjunction with the DCSC USMS, collaborate with the DOC to facilitate its operation of the pilot project to release eligible defendants directly from the courthouse. Defendants in all misdemeanor and traffic courtrooms were eligible to participate in the pilot program.  The Courthouse Release Program has been operating since 2008 and the number of eligible defendants has expanded over the past ten years.  The courthouse release program operates Monday – Friday and all applicable paperwork must be delivered by 3:30 p.m. to the main cellblock.

DOC has final authority as to whether a defendant is cleared for release at the courthouse.  The IRO has had the same staff member, a Lead Legal Instruments Examiner(LLIE), assigned to Superior Court since the inception of the Courthouse Release Program.  The LLIE is stationed with USMS staff in the main cellblock.

The USMS delivers all legal documents transported from the court rooms. The LLIE reviews all of the documents to ensure they are signed and dated. If there is a problem with any of the documents, the LLIE will contact the Quality Assurance clerk to have the paperwork fixed. All Court Ordered Releases (COR) are prioritized for immediate processing. The remaining documents are reviewed for short sentences—less than 180 days—and prioritized for processing.  Once the paperwork is verified, the LLIE conducts the procedures as outlined below and highlighted in *Figure 3*.

1. The LLIE scans the order, creates a PDF, and files it ███████ ████████████ for access and subsequent processing.
2. The LLIE then creates the appropriate transaction in the ████████████████████ IRO staff at the CDF.
3. Signs into ████████ to check ███████. A search is done ████████



Next, the LLIE checks ███████ for detainers, verifies releases, and ███████

5. Checks ███████ to check for open cases.
6. IRO staff at CDF ███████ will process the release.

*Figure 3*

7. Once the LIE processes the case, one other LIE will review it and a supervisor will sign off on the release. In total, a COR from Superior Court has four IRO staff members who review the case.

While observing the LLIE perform these tasks, there were times when the computer was buffering and, on one occasion, needed to shut down and reboot.  This adds unnecessary time to a time-sensitive process.  Since the LLIE does not have access to the inmate's paper file, the review of the case doesn't count as one of the three reviews required.  The LLIE does not fill out a checklist.

The LLIE periodically checks ▇▇▇▇▇▇ system to see whether any of the COR cases have been cleared for release.  In order for an eligible defendant to be directly released from the courthouse, the LLIE must receive the authorization by 5:00 p.m.  When asked whether it has taken longer to receive clearance to release inmates in the past few months, the LLIE noted it has taken longer in the past couple of months and a number of inmates have had to be returned to the jail for release there.  If the authorization is not received in time, the inmate is returned to the IRC to be released.  In these cases, the Court Transportation Unit staff member has already gone back to the jail to retrieve the inmate's property and medication. The CTU will need to return the property and medication to the IRC along with the inmate.

## DC DOC Internal Stakeholders

TMG was asked to review the current staffing deployment, workload, and coordination between IRO staff and the following DC DOC areas:  Inmate Court Transportation Unit, Inmate Reception Center and the Case Management Department.  The staff from all of these areas collaborate and coordinate their functions to ensure timely releases.

### D.C. DOC Inmate Court Transportation Unit
Pursuant to the IGA between USMS and DOC, DOC transports and provides "guard services" for inmates going to and from CDF or CTF and D.C. Superior Court or U.S. District Court. The IGA also provides that DOC staff will execute "detainer pickups based on bench warrants" for prisoners arrested on DC Superior Court Charges within a fifty-mile radius of DC as directed and coordinated by the USMS. DOC staff regularly transport prisoners from Greenbelt and Baltimore, Maryland to federal courthouses in Greenbelt and Baltimore. CTU staff reported they have frequent communication with USMS staff and noted they are able to work together to accomplish the mission.

There are approximately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ While this staff complement is sufficient to cover the mission assigned to the CTU, it does not account for staff leave and training schedules. If all staff are not available to work an assigned post, management staff may need to pull staff from Central Cellblock or have staff members work overtime to cover the posts.  There are two staff assigned to this Unit who have Commercial Driver's Licenses (CDL). If one of the CDL-certified staff members is on leave or in training, the remaining CDL certified staff member has to work a double shift or the staff have to transport the inmates in vans as opposed to the bus. While the volume of inmates being transported between the jail and the courts varies, the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

CTU staff receive a copy of the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ list the day before the inmate is to be brought to court.  However, on occasion, judges (both Superior and U.S. District Court) will issue "forthwith" orders to have a prisoner brought to court on the same day.  For USDC matters,

the USMS notifies the DOC, via e-mail, either the day before or the morning of, to bring a prisoner to USDC for court proceedings.

In D.C. Superior Court, there is a CTU staff member co-located with the LLIE in the cellblock along with USMS staff.  These staff work together to ensure they have all of the necessary paperwork for each prisoner transported to a DOC facility.  The CTU staff deliver the paperwork to the IRC staff.  In the event a prisoner is to be released from DCSC, a CTU staff member will return to the IRC and pick up the prisoner's property and any necessary medication or prescription and return to DCSC with those items.  If the prisoner does not get cleared for release by the IRO by the 5:00 p.m. cut-off, the prisoner and his or her property and medication needs to be returned to the IRC for release from there.

### DC DOC Inmate Reception Center (IRC)

The DOC's Inmate Reception Center (IRC) is located at CDF and is overseen by the Operations (custody) Department.  While there is not a set staff complement for the IRC, there are specific posts on the Master Roster for the IRC.  TMG interviewed supervisory staff in the IRC and observed several different aspects of the IRC operation to include: intake and screening for a new commitment, release of inmates from the CTF and CDF, processing inmates returning from court, process of taking off restraints, handling flow of inmates within IRC, physical body scanning, fingerprinting, photographing, issue of institution bed roll and keying of data for new commitment.  Staff in the IRC applied proper security and correctional management protocols for all the functions observed.

IRC staff asked each inmate for their name and number, comparing the documents they received from the escorting officers, simultaneously comparing physical appearance and information received with the picture and information contained on the computer.  Once the inmate was properly identified, receiving documents were either hand delivered to the Lead LIE stationed in the IRC or placed in IRO tray.  The LLIE date stamped the documents, reviewed them and entered the data ▮▮▮▮▮▮▮▮▮▮.  The LLIE would personally deliver urgent documents, including possible immediate releases, to the IRO for processing and verification. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Further review of this case revealed the inmate should not be released due to a new law three-year sentence.  IRC staff and IRO staff have frequent contact and work well together to ensure inmates are released in a timely manner.

### DC DOC Case Management (CM) Department

DOC's Case Management Department oversees inmate services, classification, custody issues, phone calls, liaison on inmate concerns and issue to the 18 housing units with a total population of 1242. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Case management staff completes Residential Reentry Center referrals but all of the other release paperwork (i.e. law enforcement notifications, halfway house paperwork) is handled by IRO staff. When inmates have issues regarding sentence computation or release matters, they ordinarily raise them with case management staff who in turn calls IRO for a response.  The responsiveness and helpfulness of the IRO staff varies greatly.  Inmates also have the option to use the grievance process that has five levels of appeal.  The Inmate Grievance Administrator noted that between January 1, 2018 and August 10, 2018, there were 21 informal grievances filed pertaining to the IRO.  There were a variety of topics regarding sentence computations, inmate behavior credits, and release issues.

## Untimely and Erroneous Release Report Review

## Initial Document Review

DC DOC initially provided a synopsis of, and supporting documentation for, a total of nine District Court-related erroneous and untimely releases that occurred between June 21, 2017, and June 11, 2018.  Of the nine releases reviewed, it was determined that two were untimely due to over detention, six were erroneous in nature for various reasons, and one was a release to a Halfway House based on a District Court order in question. Causes for errors range from Superior Court inmates with pending District Court cases being ordered released without a hold on file for the pending District Court case, to the untimely receipt of court documents ordering release or further detention.

Additional reports were provided related to erroneous and delayed releases. Of those with overlapping time frames, quite often, cases listed on one report were absent from another report, and vice versa. From reviewing these cases and reports, overarching themes were identified, including the following:

- Cases involved multiple complex mitigating factors and, to some extent, were found to be difficult to categorize or find a nexus connecting them with one another.
- While a number of cases were found to be clearly related to staff's failure to follow established release procedures and protocols, in many instances, the underlying cause was multi-faceted, as it involved multiple agencies or a breakdown in more than one procedure or method of communication.
- The untimely transfer or receipt and routing or processing of documents relating to the release or detention of inmates resonates throughout most reports.

## Additional Release Reports Review

For purposes of this section of the review, DC DOC provided additional documents for review and analysis.   Two reports were examined (Inmate Record Office Delayed Release Report January 2015 – Present, and Inmate Record Office Early Release Report January 2015 - Present). These reports encompassed a total of 20 untimely releases: fourteen delayed releases and six early releases over an approximately 3 ½ year period.[1] However, it should be noted that other reports provided to TMG relating to the untimely release of inmates varied in relation to the above reports.  For example, the document titled "Summary of USDC Incidents of Erroneous Release and Over Detentions from June 21, 2017 to June 11, 2018" listed a total of nine inmates, some of which were not listed on the above reports, and visa-versa.  Unfortunately, this calls into question the integrity of the data contained within the reports examined and further emphasizes the need for a unified and streamlined approach to tracking and reporting untimely releases.

Careful examination of the 14 delayed releases revealed the following: The total length of over detention in each case time varied between 6 hours on the low end and 5 days on the high end, for an average over detention time of 1.8 days. The majority of cases (12 of 14) were found to be directly related to records office staff error, primarily due to staff's failure to retrieve and process release documents in a timely manner. In one instance, the receiving and discharge staff failed to retrieve and execute release documents provided by the records office in a timely manner. One case was related to a data base malfunction and another was due to the unavailability of USMS/BOP staff to authorize the inmate's release.

---

[1] Since TMG began this review, DC DOC has identified 5 additional untimely releases, all of which appear to be directly related to records' office staff error.

Careful examination of the six early releases revealed the following: The total length of under detention in each case varied between an undetermined amount (for example, inmates released with pending charges or holds) and 0 days, therefore it is difficult to determine an average length of overall under detention in these cases.   The majority of cases (5 of 6) were found to be directly related to records office staff error, for various reasons. Specifically, 2 inmates were released to self-custody when they should have been released to treatment programs; 1 inmate was released after service of his misdemeanor sentence but had additional time remaining related to felony sentences; 2 inmates were released due to confusion related to the status of outstanding warrants/detainers.  Finally, there was one instance where the records office was erroneously instructed by the District Court USMS to release an inmate prior to his authorized release date.

In conclusion, although there are numerous outside factors and agencies directly affecting how and when the IRO releases an inmate, the reports and documentation provided to TMG appear to indicate 17 of the 20 untimely releases cited above may be directly attributed to IRO staff error.  It is not possible to classify by a single, mutually exclusive cause of untimely releases.  What is evident, however, is that there is not a pattern, practice, or policy for over detention or erroneous release.

# Comprehensive Understanding of the DC Criminal Justice System

D.C. DOC operates in a unique and complex criminal justice system that is partially federal and partially local.  TMG interviewed representatives from the stakeholder agencies noted below and who are involved in the detention or release process for incarcerated individuals.  Overall, there was a spirit of cooperation and collaboration among the stakeholder agencies.

## Federal Bureau of Prisons

A telephonic interview was conducted with staff at the Federal Bureau of Prisons' (BOP), Designation and Computation Center (DSCC), located in Grand Prairie Texas.  Specifically, with staff from their "Alpha Team," the BOP's team responsible for the classifications, designations, and computations for all D.C. Code felony sentences, US District Court offenders and parole violators. DCDOC does not compute these sentences.

### Rapport and Communication Methods

BOP staff responded favorably when asked about their rapport and communication with staff in the IRO.  Indicating that they have an open line of communication with staff in the IRO, and that they are very responsive to their requests and inquiries for the information required to complete their tasks.

Furthermore, DSCC indicated that the rapport and relationship with the USPC was strong, and that the USPC was very responsive to their needs in relation to those tasks and documents related to parole violators.  Document communication between the BOP, United States Marshals Service (USMS), and the IRC is primarily accomplished through the ███████████████████. Communication between the BOP and USPC is accomplished ███████████████. Although, BOP staff indicated that it would be beneficial if the USPC was able to communicate ██████████, conversely, they also stated that there were no concerns in relation to the current communication method.

### Relationship with USMS

The BOP perceives its relationship with both the D.C.  Superior Court and District Court USMS as both a complimentary and symbiotic one. However, they did voice a concern as it relates to the time frame in which the District Court USMS has recently been taking to process the cases transmitted to them by the BOP ███████████.  Specifically, indicating that they recently had to contact the USMS due to several cases that were sitting in the ██████████ for a lengthy period of time. One or more of these cases was designated as ██████████ case, or cases in which the BOP computes a Tentative Release Date (TRD) due to the inmate's imminent or pending release.  The USMS goal is to process █████ cases within three days. The failure to process cases in a timely manner has the potential to result in untimely releases, also known as over detentions.

## United States District Court for the District of Columbia

The United States District Court for the District of Columbia processes all felony United States Code offenses and a selection of misdemeanor offenses.  The number of DOC prisoners facing USDC charges is relatively small—approximately 200—compared to the total DOC population of approximately 2000.

The Clerk of Courts for the United States District and Bankruptcy Courts for the District of Columbia was very helpful in explaining the paperwork flow in USDC.  Upon signing an order, the judge gives

the order to the courtroom clerk.  The courtroom clerk keeps the original and gives a carbon copy (the forms are currently configured as an original with three carbon copies) to the USMS courtroom deputy, the defendant and defense counsel.  The DOC is not provided by the Court or USMS a copy of the Court Orders from USDC.  The courtroom clerk will enter the order in the Case Management – Electronic Filing System (PACER).  This usually happens at the end of the day.  Ordinarily, the clerk's office staff notifies the USMS which prisoners are needed for court proceeding three days in advance.  She did note, however, there were times judges had to issue "forthwith" orders for prisoners.

# United States Attorney's Office (USAO) for the District of Columbia

The United States Attorney's Office for the District of Columbia is responsible for the prosecution of federal crimes and serious local crimes – felonies and certain misdemeanors – committed by adults in the District of Columbia.  It also represents the United States and its departments and agencies in civil proceedings in federal court in D.C.  The office is the largest of the 94 U.S. Attorney's Offices in the country and has unique federal and local responsibilities.  The office is divided into six divisions, including a U.S. District Court Criminal Division and Superior Court Division.

In 2017, the U.S. District Court Criminal Division, brought 86 Complaints, 137 Indictments and 71 Informations.  Between January and August 2018, the office brought 33 Complaints, 168 Indictments and 56 Informations. It should be noted the same cases are likely indicated in more than 1 category.  If they need to have an incarcerated person brought to court as a witness, they will often utilize an Attorney Special Request (ASR) pursuant to 18 U.S.C. Section 3621 (d).  If issues arise with D.C. DOC, the office will contact DOC's General Counsel, who they find responsive and helpful. The USAO did not report any regular contact with DOC's IRO or sending/receiving paperwork from the DOC on a regular basis.

# United States Marshals Service for the District of Columbia

The outline of the the of the USMS-DC process below is based on interviews with various staff within the USMS-DC office. Thus, the practices outlined below are as reported and the consistency of these practices is unknown at this time.

### USMS-DC General Information
The USMS-DC houses prisoners in several detention facilities in the region, including DC DOC. Prisoners in the custody of the USMS-DC include those charged or convicted of crimes under the jurisdiction of the U.S. district courts, District of Columbia parole violators, community treatment center (CTC) failures who have been returned to closer custody and are pending disposition by the Federal Bureau of Prisons (BOP), material witnesses, and others.

Prisoners may enter the custody of the USMS-DC pursuant to probable cause arrests, executed arrest warrants, remands by the US District Court, writs of habeas corpus, attorney special requests (ASR), BOP transfers, or other processes. USMS-DC prisoners detained in DC DOC are housed pursuant to an inter-governmental agreement (IGA) between the USMS and the DOC. USDC prisoners are booked into the DC DOC using ████████████████████████████ Prisoners being produced in DCSC court for court proceedings are requested from the DC DOC ███████████████████████. Prisoners in the custody of the USMS-DC are tracked using ███████████ ███████████████████████████ The USMS has read-only access to the DC DOC information system. DOC reportedly does not have access to ████

### Inmate Custody Status

When prisoners in the custody of the USMS-DC are admitted to the DC DOC for reasons other than new district court charges, DOC staff are notified to hold the prisoner for pick-up by another USMS office, hold the prisoner for the BOP, or hold the prisoner as a District of Columbia parole violator. Each status can require the subsequent release of the prisoner by DOC to different agencies and may affect which agency is responsible for the cost of housing the prisoner.

The custody status of prisoners in the custody of the USMS-DC may change for a variety of reasons. For example, prisoners may be released on bond, transferred to the custody of the BOP, transferred to state or local custody, or released due to acquittal, dismissal of charges, or expiration of a federal sentence.

### USMS-DC Release Procedures

For prisoners who are released at the US Courthouse by the USMS-DC, the USMS-DC conducts pre-release checks to ensure that there are no detainers on file for the prisoner or National Crime Information Center (NCIC) wanted person entries.

In cases where prisoners are ordered released by the USMS-DC while they are housed at DOC, it is USMS-DC practice to check for detainers, and if no detainers exist ████████████████████████ directing their release from USMS-DC custody. ██████████████████████████████ ████████████████████████████████████████████████████████████████████ In these cases, the USMS-DC defers to the DOC to conduct pre-release NCIC queries and is notifying the DOC that the prisoner is no longer in the custody of the USMS-DC. However, it is important to note that a prisoner who has been ordered released by the USMS-DC may still be subject to detention by DOC based upon other authorities, such as a detainer lodged by another agency with the DOC or a remand issued by the DCSC.

Cases can be complicated when prisoners are housed at the jail for multiple purposes. It is very common that prisoners housed at the jail are subject to proceedings in both DCSC and USDC. It is also common for DC parole violators to have process or proceedings pending in both Superior Court and the US Parole Commission.

### Attorney Special Requests (ASR)

Prisoners in the custody of the USMS-DC may also be the subject of other pending criminal charges or other legal process in other jurisdictions. According to those interviewed, detainers for prisoners in the legal custody of the USMS-DC are lodged with the USMS-DC, while detainers for prisoners in the legal custody of the DOC are lodged with the DOC. Similarly, prisoners in the legal custody of the DOC may be the subject of warrants for arrest that are under the jurisdiction of the USMS-DC. In these cases, the USMS-DC lodges a detainer for the prisoner with the DOC, and the prisoner may subsequently be produced in USDC pursuant to an Attorney Special Request (ASR) issued by the United States Attorney's Office for the District of Columbia (USAO-DC).

When the USAO-DC needs a prisoner in the custody of the USMS-DC to appear in Superior Court, the practice is to issue an ASR requesting the USMS-DC to produce, or authorize the DOC to produce, the prisoner. However, in some cases, an ASR is not issued, and a federal prisoner housed at the DC DOC is delivered to Superior Court based solely on a "come up" from the concerned Superior Court clerk. According to those interviewed, this can lead to confusion regarding the prisoner's custody status. Confusion may also arise when orders from the court are sent directly to the DOC. To avoid confusion regarding the custody status of USMS-DC prisoners, the USMS-DC expects that there will be no change in the custody status of any of its prisoners without prior USMS-DC authorization.

# United States Marshals Service, District of Columbia Superior Court

According to those interviewed, prisoners are produced in Superior Court as defendants or ████████████████████████ including pretrial hearings, trials, sentencing and post-sentencing hearings, and other proceedings. They may also be called to the courthouse ████████ ████████, be processed on new charges, for administrative requirements, or other reasons. Prisoners may be brought into the jurisdiction by the USMS-DC/SC pursuant to ASRs, writs, or other process, and subsequently be produced in court by requests from the Clerk's Office.

The term "come up" is a generic term used to describe any request to deliver a prisoner, usually a request to produce a prisoner in court. "Come ups" may be issued by the Superior Court, the USMS DC/SC Cellblock, USMS PC Section, or other USMS entity needing the prisoner, and ████████ ████████████████ Come ups are generally issued ████████████ following the process described below.

### Order to Appear Methods and Procedures
The Superior Court sends ████████████████ to the DOC in advance of the court date to request the production of prisoners. The actual transportation of the prisoners to the courthouse is provided by the DOC or the USMS based upon a set of agreements including a 2002 MOU between the USMS, DOC, USPC, and BOP; the intergovernmental agreement (IGA) between the USMS and DOC; and a series of informal agreements between the USMS and DOC.

While the ████████████████ is the primary system used to schedule and deliver inmates for court, on occasion, other methods may be used, such as "come ups," "forthwiths," and ASRs.

- The USMS DC/SC occasionally requests a "come up" for a prisoner for its own purposes, such as to complete a booking order on new charges, to complete an administrative intake on the prisoner, or for some other transport or administrative reason. These USMS "come ups" are rare and are requested ████████████████████.

- "Forthwiths" are short notice "come ups" issued by the Court for prisoners. They are typically same day requests for prisoners left off the daily production list for some reason. Forthwith requests are made ████████████████████████ under normal circumstances. The ████████████████ in the request for a forthwith until they arrive in the USMS cellblock.

- ████ Attorney special requests (ASR) are issued by the U.S. Attorney's Office (USAO), and are generally ████████████████████ Upon receipt, the USMS ████████████ ████████████████████████ The ASR is generally shared with ████████████████████ Writs are generally handled via the same process; however, they are issued ████████████████.

### Prisoner Coordination
The USMS DC/SC Prisoner Coordination Section and Cellblock Section regularly interact with the DC DOC to manage prisoner operations. The PC section handles transport into and out of the jurisdiction and the Cellblock section handles daily prisoner transfers from and returns to the DOC and secure custody within the Superior Court Cellblock. The Cellblock also handles some transport duties to and from local facilities.
Both sections interact with DC DOC transportation units. The Cellblock has the most interaction, receiving hundreds of prisoners per day from the DC DOC transport personnel each day while the PC section has less regular interaction.

***Detainers and Release Procedures***

According to the USMS DC/SC, the DOC does not lodge detainers with the USM DC/SC, as the USMS DC/SC does not house prisoners outside of its own cellblock during court hours. Similarly, according to the USMS DC/SC, the USMS DC/SC and USMS D/DC do not lodge detainers with each other as the USMS DC/SC does not house prisoners outside of its cellblock and all USMS offices use the same database, ███████████████ for prisoner tracking.  The USMS DC/SC may ████████████ a detainer to the DOC on behalf of the BOP or another institution if the USMS transported that prisoner to DC.

The USMS DC/SC does not typically order prisoners to be released by DOC because the majority of these prisoners are in the legal custody of the DOC. On rare occasions, the USMS DC/SC may be required to release prisoners who are in USMS custody pursuant to writs or ASRs while they are housed by the DOC. In these cases, the USMS DC/SC generally forwards release paperwork to the DOC ████████████, and the DOC incorporates these documents into their custody review process and releases the prisoner if appropriate.

# United States Marshals Service, District of Maryland

When a prisoner production is required by the Court or the USAO, representatives of the Clerk's Office or USAO ████ a "come up" to USMS personnel from the Greenbelt or Baltimore Operations Office. A "come up" ████████████████████████████████████ Upon receipt of a "come up", USMS personnel enter the information ████████████████████████ At the end of business day prior to the scheduled production, USMS personnel ████████████████ ████████████████ the prisoners to be produced the ████████████████████

Prisoners may be produced pursuant to attorney special requests (ASR) when they are serving a sentence in BOP custody. In these cases, ASRs are generated by the concerned AUSA and submitted ████████████████ to the USMS. Upon receipt, the USMS initiates a prisoner movement request ████████████████████████████. Prisoners are then transferred from BOP to the USMS ████████████████████████████████, usually within 30 days.

Prisoners in the custody of other USMS offices or agencies may be produced pursuant to writs of habeas corpus, which are generally received ████████ from the concerned AUSA. When the subject of the writ is in the custody of another USMS district office (for example, the District of Columbia or the District of Columbia Superior Court), the writ is ████████ to that office for processing. In these cases, the concerned AUSA in the District of Maryland (D/MD) seeks the consent of the AUSA in the other district for transfer of the prisoner to D/MD.

For prisoner releases, the USMS D/MD requires a written order from the Court or a "come up" from the USAO, U.S. Probation Office (USPO), or U.S. Pretrial Services. These documents are generally received ████████████████ Upon receipt, the USMS adds the requested prisoner ████████ ████████████████ following the procedures described above for prisoner productions, noting the ████████████████████ Upon the prisoner's arrival at the USMS cell block, USMS personnel verify their release status, and in cases where prisoners are ████████████████████████████████████████ conduct checks for active warrants and detainers prior to their release.

Standard operating procedures documenting these practices are currently being developed by USMS D/MD. Prisoners are transported by ████████████████████████ ████████████████ The USMS D/MD lodges detainers with the DC DOC when the USMS holds an active arrest warrant for a prisoner in DC DOC custody.

# Public Defender Service for the District of Columbia

The mission of the Public Defender Service (PDS) for the District of Columbia is to provide quality legal service to indigent individuals in order to get then completely and permanently out of the criminal justice system.  PDS represents individuals facing felony charges in D.C. Superior Court as well as parole violators.  PDS is an agency of the District of Columbia and is federally funded.  They are governed by an 11-member Board of Trustees appointed by a panel consisting of the Chief Judges of the U.S. District Court for the District of Columbia, the Chief Judge of the D.C. Court of Appeals, the Chief Judge of the Superior Court, and the Mayor.  The Board appoints the Director and Deputy Director of PDS.

PDS has a section that handles approximately 1300 parole cases per year. The parole revocation hearings occur at DOC's Central Treatment Facility every Monday and Wednesday. PDS has access to ██████  PDS does not have authority to release inmates.   PDS receives a copy of the Parole Commission's Notice of Action and will monitor when their client is due to be released.  If they become aware the release has not occurred as expected, they will contact the IRO to determine why their client hasn't been released.  Staff reported the IRO Manager was responsive and helpful. They indicated there have been times when their client went out to court for a hearing, returned to the jail but when the PDS attorney arrived at the jail, they were advised their client was out of the institution.  They believe this may be caused by ██████ only be updated once per day and recommended that ██████ be updated more frequently to accurately reflect the inmates who have been returned to the facility during the day.

# United States Probation Office for the District of Columbia

The mission of the United States Probation Office for the District of Columbia is to assist in the fair administration of justice; to provide the highest quality service; to protect the community; and to improve the lives of those we serve by using the most effective supervision techniques, the most supportive treatment programs, and the finest community service partners.  In 71 of the 94 judicial districts, USPO provides pretrial services to the court.  In the remaining districts, including the District of Columbia, there are separate U.S. Probation and Pretrial Services Offices.  All of the probation officers in the USPO report to the Chief Probation Officer who in turn serves the Chief District Judge.  The Administrative Office of the U.S. Courts provides administrative support to the courts, including staffing and other resources, and enforces policies promulgated by the Judicial Conference of the United States.

The USPO supervises individuals who are serving a term of probation or supervised release from the USDC.  Ordinarily, they do not supervise pre-trial defendants except for the occasional courtesy supervision on behalf of another federal judicial district.  Additionally, USPO supervises a small number of military offenders as well as some parole offenders. The USPO does not have authority to "release" or "revoke" individuals from supervision. This release or revocation authority rests with the U.S. District Judge who placed the individual on probation or supervised release, the Parole Commission or for military offenders, the appropriate military board.

The USPO has approximately forty staff members and has two branches: Pre-Sentence Investigations and Supervision.  The Pre-Sentence branch conducts comprehensive investigations into the background of defendants convicted of federal crimes.  The staff assigned to the branch completes their investigation, applies the sentencing guidelines and submits a recommendation to the presiding judge.  The Supervision branch supervises felons convicted of federal crimes who are released into society on either Supervised Release or Probation. The US Probation Officers enforce the court ordered conditions and utilize their discretion and skills to mitigate offenders risk to society.  If an offender violates their conditions of Supervised Release or Probation, the Probation

Officer prepares a report for the judge and makes recommendations on whether to revoke the offender, not revoke and modify the offender's conditions of supervision or something else. The USPO files its reports electronically.

The USPO interacts with DC DOC frequently regarding issues such as bed-to-bed transfers to halfway houses, TB tests, and weekend offenders.  They do not have regular contact with DOC's Inmate Records Office and do not regularly exchange reports and documents with that office.

## United States Parole Commission

The mission of the USPC is to promote public safety and strive for justice and fairness in the exercise of its authority to release and revoke offenders under its jurisdiction.  The Parole Commission is a component of the U.S. Department of Justice and led by a Presidentially-appointed Chairman.  The USPC oversees all federal offenders who committed offenses before November 1, 1987, all DC offenders, Uniform Code of Military Justice offenders, probationers and parolees in the Federal Witness Protection Program, and Transfer Treaty cases.

Pursuant to the Parole Commission and Reorganization Act of 1976, the Commission makes decisions to grant or deny parole to federal and D.C. Code offenders serving of more than 1 year, sets conditions of parole, supervises parolees and mandatory releases, and recommits parolees in the event of violations of the conditions of supervision. The National Capital Revitalization and Self-Government and Improvement Act of 1997 transferred the functions of the D.C. Board of Parole to the USPC effective August 5, 1998.  For D.C. Code inmates, the USPC applies D.C. parole laws and regulations in making parole decisions. Parole was abolished, and supervised release was established, for D.C. Code offenses committed on or after August 5, 2000.

### *Parole Violation Process*
As of July 5, 2018, DOC was housing a total of 350 Parole Violators.  These violators can be in various stages of the parole violation process.  As of September 2018, once a USPC Parole Commissioner signs a warrant, the warrant is given to DCSC USMS. Once the warrant is executed, the USMS sends the USPC a copy of the executed warrant.  The USPC holds probable cause hearings at CDF.  When USPC staff are processing Notice of Actions for DC Code felony offenders, ███████ ███████ to the BOP's Designation and Sentence Computation Center (DSCC) seeking an expedited sentence computation. The DSCC sends updated computation ██████████ USPC staff reported the BOP provides them timely sentence computation information. When the USPC is directing the release of a prisoner, they send the IRO ███████████████████████ ███████████████████████████████ USPC staff send to the USMS. ██████████████████████ ████████████████████████████████████ USPC staff reported they had good communication with the IRO staff.

USPC staff ██████████████████████████████████████████████████████████████ ██████████████████████ They do have access to DOC's ███████ system and find this a very useful tool in carrying out its mission.

## <span style="color:green">Comparative Analysis</span>

The TMG team visited three jurisdictions to observe detention processes and interview staff about inmate release procedures.  TMG sought to identify jurisdictions which performed the best in detention and release processing.  There is no publicly available data identifying which correctional system has the fewest (and greatest) number of untimely releases. Correctional agencies either do not track their untimely releases, or if they do, they are unwilling to share that information publicly due to liability and public relations concerns.  TMG reached out to national organizations seeking this data and was advised no such data existed.  TMG drafted a survey and had it sent out to

correctional agencies.  Due to the poor response rate to the survey, TMG selected the jurisdictions based on their comparability to the size of DC DOC and similarity with records processing volume and complexity.   Below is a brief description of the jurisdictions visited.

## Davidson County Sheriff's Office (DCSO), Hill Detention Center

The TMG team visited the Hill Detention Center (HDC) in Nashville, Tennessee which is one of five facilities operated by, or under contract with, the Davidson County Sheriff's Office.  The HDC provides intake and release services for all five of the DCSO's facilities.  The DCSO houses approximately 860 inmates per year for the US Marshal Service (USMS).  Also, they are responsible for booking inmates for the Davidson County Sheriff's Office and Nashville Police Department. The five facilities at the DCSO house inmates with sentences of up to six years.  Inmates with greater sentences will be housed in the Tennessee state prison system.  The average daily population for the DCSO is approximately 2,500 inmates.  The DCSO processed a total of 35,000 intakes with the same amount of releases in 2017. The average daily count for court movement is approximately between 150 to 200 inmates.

DCSO's Director of Intake Services (DIS) is responsible for the day-to-day operation of the Booking and Releasing areas and its components.   The DIS indicated the total staff complement for his areas of responsibilities are 110 staff, with a total of six supervisors.  Duties are divided by areas.  The Booking and Releasing areas have a 24-hour operation consisting of three eight hour shifts and two shift supervisors.  Nine staff assigned to the Booking area per shift, three for the Releasing area per shift, four staff assigned to the Time Computation area and which only work an eight-hour shift, two staff assigned to the Pre-trial area per shift.

The DCSO staff receive paperwork authorizing or directing inmate releases through several methods   It was indicated the releasing authority is the court which mandates and signs the release orders.  For inmates belonging to the USMS they provide ▆▆▆▆▆▆▆▆▆ and the inmates do not stay committed to the DCSO.

The Time Computation section is responsible for calculating inmate sentences.  This department manually inputs prior custody credits, behavior/program credits in order to finalize the computation and match it to the future release date provided by the Court.  The Time Computation process is completed by the Time Computation Officers in just one step after the sentence is calculated.   The Booking/Releasing component is a 24-hour operation.  However, DCSO ordinarily does not release inmates at all hours of the night but rather waits until the "safe time" of 9:00 am.  This policy change was implemented after an inmate was released around midnight and tragically killed by a train.

The Clerk of Court and Fines Offices of the court notifies the ▆▆▆▆▆▆▆ with signed documents ▆▆▆▆▆▆▆▆▆▆ to be released.  The Time Computation section notifies the Releasing office staff which then performs the verification of the documents and execute the Court's order.  The Court has the signatory authority for releases.

We were informed that the Nashville Jail has not had any erroneous releases due to their own staff error since approximately four years ago in which they had four or five per year due to staff errors. They advise that the issue has been corrected as they have implemented shift audits and releases by fingerprints, preventing any erroneous releases. Presently, they reported that they had 2 untimely releases per year not attributed to staff error, citing the reason as being that the staff did not receive the release documents from the Clerk's office or received them too late.

DCSO has a policy on Booking, Releasing, and Sentence Computation procedures.   Training is conducted for new staff by on the job, hands on training for thirty days on first shift and then the new staff will be assigned an "anchor staff" (experienced staff) to shadow and train with that staff for two weeks.

Staff in the Booking/Releasing, and Time Computation areas wear uniforms consisting of green tactical pants (5.11s) and a black polo with the DOC logo embroidered on the left side and their names on the right side.  The uniform gave the impression that it promotes camaraderie. In their uniforms, staff appear to be professional and resemble a cohesive team.

The Time Computation section and Release sections have a file cabinet which contains the files and documents of future inmate releases for the next 30 days.  The practice of reviewing the next 30-day releases assist staff to work a step ahead for future releases and allows them the opportunity to re-check and prevent a month in advance any possible computation error.

Staff appear to be content with their work and there are three to four staff per areas in an office (which is a converted cell).   Within the office they are separated by cube spaces.  Staff expressed the cubes provide a productive environment appropriate for concentrating, promoting a sense of ownership and providing some privacy for phone calls.
 The Sheriff indicated he conducted monthly meetings with outside stakeholders and components and the Chief of Police to discuss issues of mutual concerns. Absent any specific issues to discuss, this meeting/lunch provided an opportunity to spend time together and develop a relationship with these stakeholders.  The Sheriff indicated this was time well spent to assist future interactions with stakeholders in times of crisis.

## Philadelphia Curran-Fromhold Correctional Facility

The Philadelphia Department of Prisons operates five institutions at a prison complex in Philadelphia, Pennsylvania that house female and male inmates for the City and County of Philadelphia.  TMG consultants visited the Philadelphia Curran-Fromhold Facility (PCFCF).  The PCFCF provides intake and release services for all five institutions.   In calendar year 2017, PCFCF processed a total of 27,956 intakes and released a total of 28,308 inmates.  Only a few federal inmates are held at this facility for the USMS.  The average daily population for all of the facilities is approximately 5,000 inmates.  The count for court movement is approximately 150 to 200 inmates for all five facilities.   Inmates with sentences greater than two years are housed in the state of Pennsylvania prison system.

The Philadelphia Sheriff's Office staff are in charge of transporting inmates going to court for the five facilities at the PCFCF complex.  Internal movement among facilities, such as routine transfers/disciplinary cases are handled by Prison Transportation staff from the PCFCF, after review and approval by the CMR management staff. CMR staff process an average of 20 to 40 transfers a day.

At the PCFCF the Director of Records is responsible for processing the paperwork for the Registration (which is Admission and Discharge), Classification, Movement, and Records (CMR) areas.   The total staff complement for the CMR areas are 77 staff of which 42 are assigned to 14 posts on three 24 hour shifts with a total of eight supervisors, five supervisors on day shift, two on evening shift and one overnight.  Although the CMR area has only 3 to 4 staff assigned per shift.  Duties and work in this department is divided and assigned to staff based on the post they are working.  Posts orders describe the responsibilities and work to be performed.  There is a designated Release Officer (RO) whose sole responsibility is to be in charge of preparing and processing all documents for discharges.  There are three civilian staff that work in the Records Office which are city bid jobs and one of them is assigned to solely process house arrests.

Staff interested in working in the CMR areas bid for the post. The qualifications or criteria for hiring staff in these areas are officers usually with tenure of at least two years. The average length of tenure in the CMR area is 10 to 15 years or longer.  The Director and the Deputy Warden are usually in charge of reviewing and selecting the staff that will work in the department.  CMR staff receive the same pay as officers and titles are the same as security or correctional staff.

CMR staff only receive documents from one court, the City of Philadelphia Criminal Justice Center and their Office of Justice Records (OJR).  Therefore, the paperwork flow is consistent and deemed by staff to be very good.   The OJR has been in place for approximately eight years, their Criminal Justice System Clerk of Quarter Sessions sends the documents directly to staff at the CMR ███████ ██████████████████████████████████████   Since this is the office originating the official court documents, it eliminates the need of verifying the legitimacy or authentication of the documents, saving time for staff in charge of processing the documents at the CMR office.  The Philadelphia Police are responsible for booking their own inmates within the booking area of the jail and handling arraignments.

PCFCF staff provide intake and release services to five facilities within the complex. Although inmates are released from all five facilities, most inmate releases occur from the PCFCF and occur within a two-tier verification process.   When inmates that are not in the PCFCF are to be released, the Registration (Booking) area notifies the Control Center of the pertinent facility, the Medical services area, and the Records office of the inmate's release.  The release process starts with the RO preparing all release documents.  Then the releasing authority for the PCFCF, which is the Sergeant in charge of the shift, verifies the documents prepared by the RO, identifies inmates via the "Arm-Wrist band", and reviews the photo and fingerprints to ensure the correct inmate is being released.  The release (discharge) operation is conducted 24 hours a day and there is no restriction regarding when an inmate may be released from custody.  Some inmate releases are done at the court house and handled by the Records office staff.

The Clerk of Quarter Sessions notifies the CMR office of the inmates to be released and CMR staff process the release paperwork. The CMR staff uses a "Clearing Court Board".  This board contains the name and count of all inmates that went to court for the day. Once the CMR staff receive notification of an inmate releasing from court, they update the board to ensure they account for all inmates that went to court for the day.

PCFCF does not systematically track untimely releases. TMG was informed untimely releases are very rare and they have no requirement to prepare untimely release reports.  However, if they have an untimely release, staff prepare a "flash report" to immediately notify the chain of command and all necessary components with a brief description of the incident.  After an untimely release, a full investigation is initiated to determine the cause and implement corrective action.

CMR staff have developed a good working relationship with the Office of the Public Defenders of Philadelphia (PDP).   CMR staff indicated and we reviewed documents wherein the PDP office sends on a daily basis to their Prison liaison at the Records Office a memorandum with names and numbers of their clients with unresolved release or sentence issues seeking assistance.  CMR staff review the issues and provide a written response to the PDP.  This process assists CMR staff, the PDP office, and the inmate to prevent and avoid potential untimely or delayed releases.

CMR staff are part of a bargaining unit. They receive free uniforms once a year and also receive a uniform allowance once a year.  The uniforms are a white embroidered polo shirt with the PDOC patch on the left side of the chest and names embroidered on the right side with black long-leg tactical type pants. The uniform projected professionalism and camaraderie.  CMR staff were observed to have a teamwork approach to expedite daily tasks. The CMR office area is divided in

cubicle style with a desk, single computer monitor, and a telephone.  The cubicle set up offers privacy, a sense of individual ownership, and comfort.

## Montgomery County Department of Correction and Rehabilitation

The Montgomery County Department of Correction and Rehabilitation (DOCR) is comprised of three correctional facilities:  Montgomery County Correctional Facility (MCCF), Montgomery County Detention Center (MCDC) and Pre-Release Center (PRC).  MCDC handles the intake and law enforcement processing of adult male and female offenders in Montgomery County.

The current population of DOCR is 771 inmates.  In 2017, DOCR processed 5,798 intakes (averaging approximately 483 per month) and processed 5.582 releases (averaging approximately 465 per month.)  Ordinarily, inmates serving a sentence of 18 months or less serve time with DOCR. For sentences greater than 18 months, inmates will be transferred to the Maryland Department of Public Safety and Correctional Services.  There are occasions when a judge will sentence a defendant to consecutive 18-month terms and specify if the sentence is to be served in the county DOCR.

The vast majority of inmates in DOCR come through the Montgomery County Circuit Court (which handles more serious criminal cases) or the two District Courts in Montgomery County (Rockville and Silver Spring).  The DOCR's Records Office receive court documents  by the Montgomery County Sheriff's Office when they return from court with the inmate.  The Sheriff's Office is responsible for transporting the inmates to and from court and between DOCR facilities.   Some inmates get released directly from the Courthouse by the Sheriff's Office.   The Records Office staff also has access to court computer systems                .  DOCR's              pulls information from the courts computer system (i.e. status of cases).

The Records Office currently has 13 staff members, including three managers and one Office Services Coordinator. The Office Services Coordinator manages the office supplies and equipment as well as the paper files.  The remaining staff are Correctional Records Coordinators (CRC).  The office operates on a 24-hour schedule with the bulk of the staff working the day shift 6:30 a.m. – 3:00 p.m.  The shifts are staggered and overlap. Inmates can be released 24 hours a day, although if the inmate is at MCCF, the Sheriff's Office will not transport them to MCDC after 9 or 10 pm and so they would be released the following day. The office set up is conducive for privacy and comfort and had a relaxed atmosphere. The workstations are arranged in a manner that gives staff a sense of privacy and permits interaction between staff. The staff in records have worked there for at least ten years with the longest tenured employee serving 36 years.

There is no formalized training program for staff in the Records Office.  There is a Field Training Officer who does train incoming staff on their new duties.  This Field Training Officer works in the Records Office and performs the training function as a collateral duty.  Staff are cross-trained to perform all of the various functions within the office.  The duties are divided up by function and staff rotate performing those functions on a regular basis.   Task assignments are those things that need to be completed by the end of the day.  The task assignments are rotated on a monthly basis.  The more specialized tasks are rotated on an annual basis. There are staff dedicated to processing inmate releases.  This function rotates on an annual basis.  The office should have a full-time Dimunition Specialist (also known as a Sentence Computation Specialist).  Due to a hiring freeze, that position has been vacant for some time and other staff in the office have been doing the sentence computations.  The Records Office handles all of the transportation paperwork for inmates coming into and departing the correctional facilities.

For all inmate releases, the paperwork is prepared by a CRC, reviewed by a Supervisor, and then reviewed by the Records Office Manager. For inmates serving sentences, the staff pull paper files, review the computations, and run detainer and warrant checks two weeks in advance.  They do another detainer and warrant check the day the inmate is scheduled to be released.  In 2017, DOCR had a total of 4 untimely releases.  One inmate was released a day early and the remaining 3 inmates were released a day late.

There were similar practices in release processing in all three jurisdictions visited.  For example, all three jurisdictions operate a 24 hour/day Records Office operation; have staff assigned to perform specific functions, i.e. sentence computation and releases; have sentence computation and release policies; and none have a formalized training program for Records Office staff.  Two of the jurisdictions have staff uniforms for the Records Office staff and two receive court documents directly from the Clerk's Office via e-mail.  It was not possible to compare the staffing in the Records Office with DOC's IRO with two of the jurisdictions due to the fact the Records Office in those jurisdictions had different duties, i.e. classification, transportation, etc.

# DC DOC and Relevant Stakeholder Recommendations

Based on the data provided by DC DOC, we found the vast majority of untimely releases over the past 3-1/2 years were due to DC IRO staff error.  In many instances, the underlying cause was multi-faceted and difficult to categorize or find a nexus connecting them with one another. There are several steps DC DOC can take, which should be prioritized by DC DOC, to reduce the possibility of untimely releases. These include but are not limited to: finalizing and implementing the Technical Reference Manual; developing and implementing a Sentence Computation Manual; creating and delivering training for IRO staff and; creating and implementing several additional quality process audit systems. Additional information regarding these recommendations is further described in the subsequent section.

For ease of reference, the recommendations provided below are arranged in relation to relevant category and not sequenced in terms of priority. TMG encourages the DC DOC to review the recommendations listed below and determine a strategic plan for implementing the prioritized recommendations in an intentional and deliberate order with attention paid to overlapping initiatives that ensures consistent and supporting messaging. TMG is willing to collaborate with DC DOC to determine priority areas, in addition to those listed above, and the resources required to ensure capacity for implementing the priority recommendations effectively and sustainably.

Recommendations designated with an asterisk (*) are based on practices observed or reported from other jails that were visited as part of a comparative analysis conducted, which was stipulated within the scope of work for this project.

## DC DOC and the Inmate Records Office[2] Recommendations

### Equipment and Technology

1. **Provide IRO staff with the equipment and training to use dual screen technology.**

   DOC IRO staff would benefit from the ability to use readily available dual screen technology, wherein they can view and work on multiple documents and programs simultaneously.  For example, while computing a sentence, LIEs can have the court document(s) displayed on one screen, while simultaneously entering date into Lotus Notes on the second screen.  This can be accomplished without the need to close or toggle back and forth between documents or programs, thus saving time, and reducing data entry errors.

2. **Transition into modern software applications.**

   Update software programs for IRO staff, such as ███████████████████████████ ██████████████████████████████████████████ for data management.

3. **Install cubicles, or some type of workstation configuration, in the IRO.**

   The current design of the Inmate Records Office is a large, open office area. The work areas for the Legal Instrument Examiners do not offer a private space to complete their tasks, most of which require focus and concentration. Having some sort of partition or barrier between the work areas should reduce the noise and distractions and provide a better work environment.

---

[2] See page 6 for additional information related to the Inmate Records Office.

4. **Continue working toward a paperless environment**.

Paper documents often get lost or misfiled, as is the case in a number of the erroneous and untimely releases noted above. A secure and backed up paperless environment greatly minimizes the risk of losing or misplacing a digital document and provides a tracking mechanism from inception to completion. The DOC's development and current use of the ████████████████████ is a significant step in the right direction.

Currently, court return documents are received from three different court systems; D.C. Superior Court, U.S. District Court (District of Columbia & Maryland), in the following ways.

- ████████████████████ (these are court orders received in the IRO satellite office at DC Superior Court)
- Hand delivered from IRC (throughout the day and as the "last load envelope")
- Hand delivered from Case Managers (GTC awards for program participation)

All documents should start as an electronic document at their point of origin and follow an established workflow. On November 7, 2017, the District of Columbia's Office of Contracting and Procurement issued a Request for Proposals (RFP) seeking a Contractor to develop, install and implement an Offender Management System (OMS), which shall replace the current jail management system.

The RFP included a request for the Contractor to provide an Enterprise-wide Content Management (ECM) solution that allows DOC to capture, extract, index, store and display all inmate documents and automatically update the Offender Management System with inmate record data. The ECM system shall significantly improve the accuracy of the inmate records being created. The current ████ system is time-consuming and outdated and it does not incorporate into the computation process good behavior credit. Sentence computations, as well as behavior credits, education, special projects, and work details are all manually entered into ████ This practice leaves a large margin for staff calculation error. Having a new system that can automate a number of these functions will be helpful. The ECM shall allow DOC to retrieve images of paper documents online for review and processing. The ECM shall replace the functionality of the ████████████████████ It is critical that the (ECM) portion of this project move forward and that a paperless system be implemented.

*Paperwork Flow and Authorizations*

5. **Establish procedures that ensure IRO paperwork received in Receiving and Discharge (R&D) is expeditiously delivered to the IRO.**

It was observed that upon return from court proceedings, the paperwork accompanying inmates is placed in an IRO inbox located in the Inmate Reception Center[3] (IRC), to await pick-up by IRO staff. Staff from the IRO are notified telephonically by the IRC staff when this occurs and are expected to pick up the paperwork. This method may create time delays in the processing of documents related to inmate releases.

---

[3] See page 11 for additional information related to the DOC Inmate Reception Center.

- Assign the responsibility to an IRC staff member to take all paperwork to the IRO immediately upon receipt.
- Station a LIE in the IRC during peak movement or processing hours who will immediately scan and enter the paperwork into the IRO system for processing.
- Evaluate the feasibility or prudence of returning to the "dumbwaiter" system of transporting paperwork between the IRC and the IRO. Implementing the paper chute system will allow DOC to relocate the Lead LIE at the IRC back to the IRO for effective use of that resource's competence and knowledge.

6. **Consider eliminating the trial basis requirement for the IRO supervisory staff to call** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **prior to any release.**

   There does not appear to be any value added to the release process by ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This ▮▮ requirement was to be implemented on a trial basis.  The management staff ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and this additional step is adding time to an already time sensitive process. Both the IRO staff and ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ do not seem to believe it is adding value to the release process.

7. **Evaluate whether requiring three signatures and completion of the Release Clearance Checklist for every release is an effective checks and balances system for the release process.**

   The Release Clearance Checklist and three-signature requirement have been in effect for approximately three months.  DOC staff, to include IRO staff, should review whether these new requirements have improved the release process, uncovered any errors, had an impact on release processing time or had any unintended consequences.  This evaluation should determine the impact the requirements have had on the Superior Courthouse Release Program[4] and the DOC's compliance with the DOC Inmate Processing and Release Amendment Act of 2012.  The DOC should then decide whether to maintain, modify, replace or eliminate these requirements for all or certain (i.e. Superior Court) releases.

## DC DOC and IRO Leadership

8. **\*Upper management should conduct regular meetings with IRO staff.**

   On a regular basis—monthly, quarterly, or, at minimum, bi-annually—leadership should meet with staff to get involved in what happens in the IRO.  This provides the opportunity to listen to IRO staff, stay connected with the issues, support staff efforts, and work on challenges or solutions that affect the operation of the IRO.

   Further, the IRO supervisor should have weekly, or, at minimum, bi-weekly regular meetings with all staff to celebrate successes, communicate issues, challenges, or events that have transpired that affect daily IRO operation. This practice will allow for staff to feel supported and open up communication for professional development and the prevention of potential errors in work.

9. **\*Upper management should consider conducting monthly meetings with outside stakeholders, such as the USMS, MPD and BOP, to discuss issues of mutual concern.**

---

[4] See Page 9 for additional information related to the Superior Court Release Program.

This practice was reported by a local jail where leadership indicated that monthly meetings are conducted with outside stakeholders to discuss issues of mutual concerns. If there were no issues to discuss for that month, they had an opportunity to spend some time together on a one-to-one basis. This practice has reportedly been successful in establishing good rapport and engaging with key stakeholders in times other than in crisis situations.

### IRO Staff Training

10. **Create formalized training for LIEs assigned to the IRO.**

The IRO appears to lack a formalized and documented training for LIEs.  Currently, the training is conducted through a combination of on-the-job training, "break-out" training sessions, and ongoing guidance from peers and supervisors within the IRO.

    a.  Once the Technical Resource Manual is finalized, use the manual to model a comprehensive training program for LIEs that is formally schedule, administered, and documented accordingly.
    b.  Develop a two-session or tiered training program, with a structured certification process such as the following:
        i.  Tier 1:  *Basic IRO Training*– Computing Sentences, Application of Good Time, Reading and Interpreting Legal Documents, etc.
        ii.  Tier 2:  *Advanced IRO Training*– Understanding and Applying Statutes, Codes, Laws, Case Law, Aggregated Sentences, Concurrent Overlaps, etc.
    c.  Administer testing following the training session that will demonstrate knowledge retention and allow trainers or managers to focus on individualized training plans in areas where staff may have struggled in comprehension.
    d.  Assign each staff a rotating shift after completion of basic and advance sentence computation training for them to be familiar and gain proficiency of the total operation of the IRO.
    e.  Incorporate a quarterly refresher training session that uses live examples (omitting names of staff and inmates involved in the events) that transpired that quarter at the IRO, which created challenges, errors, or good results by staff.
    f.  Ensure all supervisory staff have formal supervisory training, with scenario-based learning and regular annual refreshers of necessary management skills.

### Process Efficiencies and Quality Assurance

11. **Establish an Operational Program Review Process for the IRO.**

Establish a self-monitoring quality assurance system that provides oversight of the IRO program performance and compliance.  Oversight should involve monitoring specific program areas, conducting risk assessments for the purpose of creating new guidelines, and analyzing program performance trends and other data to achieve continuous program improvement.

These reviews would be designed to examine compliance with laws, rules, regulations, and policy. In addition, they would serve to examine the adequacy of controls, efficiency of operations, and effectiveness in achieving program results.

In addition, the Program Review Team would provide a comprehensive analysis of specific program performance and IRO patterns and trends while serving as a liaison with external agencies.

12. **\*Implement an official departmental manual on sentence computations.**

A manual on sentence computation will establish a knowledge-based operation, promote competence, efficiency, and consistency in the IRO.   We understand the drafting of the Sentence Computation Manual is underway and has been under development for some time. The Manual should serve as the instructional document on which DOC staff will rely to compute sentences.  It should be completed as soon as possible.  The Sentence Computation Manual and Technical Reference Manual should form the basis of IRO staff training.

13. **Consider establishing an audit system for sentence computations, such as a review process where the computation is calculated by the LIE, reviewed by the Lead LIE, audited by the Supervisory LIE, and a final audit by the CPO prior to the inmate releasing.**

It was reported that once the sentence is calculated, it is not audited or reviewed again until the day before the inmate is released from his sentence. The cases with sentences of 180 days or less are computed and reviewed the same day the Supervisory LIE receives them. This practice is concerning as the possibility of incorrect credits or miscalculations of the computation can result in an erroneous release.

An audit system that tracks release dates at 6 months, three months, or, at a minimum, a month in advance for inmates with short term sentences will improve the margin for error and allow IRO staff more time to process and plan for releases.

14. **\*Develop a file cabinet system that contains files and documents of future releases.**

Review the records and prepare the release paperwork for inmates serving sentences at least two weeks, but possibly, up to four weeks, in advance of the inmate's scheduled release.  Staff must re-check for warrants and detainers on the day of release.  Having as much of the process completed as possible in advance will streamline the process and should reduce the stress of trying to complete all the necessary tasks on the day of release. This process was observed at a local jail and is reportedly a reliable system.

15. **\*Consider implementing the use of a "Clearing Court Board."**

This will allow DC DOC IRC staff to monitor the movement of inmates that went to court for the day and keep track of any inmate that may release directly from court. This practice was observed at a local jail where the Receiving and Discharge staff currently uses this system. The board contains the name and count of all the inmates that went to court for the day. Once the staff receive notification of an inmate releasing from court, the board is updated to ensure all inmates who went to court that day are accounted for.

16. **\*Incorporate a quality process audit on each shift.**

One staff member would be responsible on each shift on a rotating basis to review the previous shift's releasing documents. This process is intended to double check the inmate release documents, computation information, and accuracy of the work conducted by staff on the prior shift. This practice was observed at a local jail and was reportedly helpful. Errors that were caught during this review process were corrected and used as learning opportunities for staff.

17. **Continue conducting a routine reconciliation of the custody status of all prisoners.**

On a weekly, or potentially more often, exchange prisoner lists between USMS-DC and DC DOC to ensure custody status is properly reflected in DC DOC and USMS files and information systems. Identify any errors and coordinate their correction by USMS and DOC.

### Staffing

18. **Examine the management structure in the IRO and whether it is meeting the DOC's needs and gaining the outcomes from staff that are expected.**

The current structure of the IRO appears to be fairly top-heavy. There is a higher need for operational staff assigned to a particular function and less managerial staff. There is also a discrepancy between the LIE and the Lead LIE positions, which both appear to have the same task expectations yet are on different pay grades. All Lead LIEs and LIEs should be given the same title and designated as the same grade to resolve this unnecessary internal IRO staff conflict.

19. **Evaluate the grade structure for the IRO staff and determine whether any changes should be made to ensure staff in the IRO are compensated appropriately for the specialized, technical job they perform.**

The IRO needs the ability to recruit and retain the most qualified staff to perform their vital mission. The pay grade needs to align with the level of skills needed to competently perform their tasks.

20. **\* Designate a Training Coordinator for the IRO.**

Having a staff member designated to develop curriculum, provide training, develop and administer pre-testing and post-testing for the training and document the provision of training to IRO staff would assist in ensuring staff have the necessary information to perform their duties. These functions could be performed collaterally by an IRO staff person although it is important to ensure they have sufficient time to focus on these training functions.

21. **\*Designate an Office Services Coordinator for the IRO.**

An Office Services Coordinator would be responsible for ordering supplies and equipment for the IRO staff and ensuring the equipment is serviced appropriately. These functions can be performed by a support staff/administrative assistant-type position and could be combined with other administrative-type duties. The Office Services Coordinator could also be responsible for managing and archiving the older (non-active) files for the IRO.

22. **Hire an attorney for DOC's Office of General Counsel who can focus on IRO matters.**

DOC's Office of General Counsel currently has two attorneys, including the General Counsel. Having an additional attorney to assist the General Counsel with the additional time needed to focus on providing legal advice and legal sufficiency review of policies, training, and litigation related to sentence computation/release matters would enhance the operation of the IRO and mitigate risk for the DOC. The attorney should work under the direction and supervision of the General Counsel.

23. **\*Pilot adding a third shift to the DOC's Inmate Records Office.**

While DC does not release inmates 24 hours a day, having a skeletal staff on the overnight shift could provide more coverage for staff to prepare for the releases scheduled for the next day.  These staff could review the paperwork and conduct the necessary checks for the releases.  This recommendation can be accomplished utilizing the existing staff in the IRO. This practice was reported at all local jails visited and appears to be best practice.

24. **\*Consider assigning staff to teams to perform specific functions.**

Designate staff to certain functions, such as sentence computations, jail credits, and releases.  This would allow staff to become proficient in a specialized area and would allow them to focus on particular types of tasks on a daily basis.  Staff could rotate on quarterly or some other regular basis and eventually, rotate through all the various teams. This practice was observed at other jails and reportedly is efficient and preferred. Staff at DC DOC reported this system was used in the past and expressed a desire to return to this structure.

25. **Increase the number of staff with a Commercial Driver's License in the Inmate Court Transportation Unit[5]**

DOC should have more than one staff member per shift with a Commercial Driver's License to ensure the efficient transport of prisoners back and forth between the courts and DC DOC facilities.  DOC could ascertain whether there are any DOC staff who have a Commercial Driver's License who would be interested in, and qualified to, work in the CTU.  In addition, DOC could ascertain current staff who already maintain CDL licensure or DOC could facilitate and pay for existing CTU staff to receive their CDL.

### *IRO Culture*

26. **Provide IRO staff with additional workplace comforts.**

The layout of the office does not currently provide a space for staff to gather. A room previously used as a break room for staff to store and eat lunch has been converted into an office. This space could be repurposed as a break room, or another location identified, with a refrigerator, microwave, and small table and chairs. DOC can add a bulletin board in the break room for staff to communicate in a positive nature.

DOC should provide each staff member in the IRO with a work phone line.  Staff may use the option to mute the phone ringer and have it flash instead, which will minimize distractions from ringing. IRO staff are currently prohibited from having a mobile or work phone at their work stations, which restricts them from work and personal obligations or being notified of emergencies in an immediate fashion.  DOC should allow staff to choose either a one-hour lunch break or a half-hour with two 15-minute breaks and stagger staff lunches so that enough are on the floor working as needed. DOC should allow staff to eat and drink at their desks. With cubicles, staff would have room to do so away from paperwork and computers.

27. **Improve morale in the IRO.**

When asked what the best part was of working in the IRO, almost all staff interviewed said that they enjoyed the work they did, enjoyed their co-workers, and felt the work was challenging and interesting. There were, however, concerns reported regarding poor staff morale, disrespectful communication, the appearance of favoritism, and an overall

---

[5] See page 10 for additional information related to the Inmate Court Transportation Unit.

environment where staff do not feel valued and believe only mistakes are acknowledged by leadership. These conditions may contribute to the regular occurrence of staff shortages on shifts, with several on administrative or sick leave, out on FMLA (Family Medical Leave Act), or on vacation.

DC DOC and IRO leadership need to make clear that the DOC and the IRO expects all staff to be treated with respect, in alignment with previous DOC initiatives regarding a respectful workplace.

28. **Re-brand the office and elevate the reputation of the IRO.**

Refresh the culture of the IRO and its staff with a professional and outcome-oriented atmosphere that elicits more employee pride and respect from fellow staff and external stakeholders. Ensure the message is received that the work of the IRO is mission critical to the DC DOC.

While "Legal Instrument Examiner (LIE)" is used in other government agencies, the DC DOC should consider changing the title to something that more accurately depicts the type of work that the records office staff conducts, such as "Time Computation Officer" and "Releasing Officer."

Once the IRO has implemented culture changes efforts, leadership should conduct outreach with IRO staff through surveys, focus groups, or individual check-in meetings to review how the office is functioning and if changes are making a positive impact or should be modified.

29. **\*Evaluate and consider providing the IRO staff with uniforms.**

A formal uniform makes staff appear to be part of a professional cohesive team, promotes camaraderie and ownership, and provides a sense of respect to the profession or title. Uniforms should include the DC DOC logo embroidered and staff names. This practice was observed at all local jails visited and appears to be common practice.

## *Technical Resource Manual (TRM)*

TRMs are typically policy-related publications that supplement directives by providing instructional, descriptive, or explanatory material.  The authors of the manual should be commended for their hard work and the thought and detail that went into developing this TRM.

Overall, the TRM was found to be well structured, easy to follow, and in general, a very comprehensive overview of the functions conducted by a records office. This TRM, when used properly, will greatly assist staff in the IRO to better understand their daily tasks and duties, while at the same time, providing them with a much-needed quick reference document.

30. **Review and finalize the Technical Resource Manual.**

The TRM is currently in draft form. Whichever process DC DOC uses for formalizing resources such as this should be expedited so that training modules can be created, and staff can be assured that processes and practices are confirmed. When finalizing the manual, consider adding an index with sections or chapters that are tabbed for ease of reference.

31. **Create and include a glossary of terms.**

Although there were a few areas that defined the terminology used throughout the document, it is recommended that a glossary of all the terminology be added to the back of the document as a quick reference guide for those unfamiliar with the terminology.

32. **Clearly mark and list directives that are referenced.**

There are a few sections of the draft document that referenced the directives used to create the document, e.g., policy, law, statute, and code, etc.  It is recommended that any section of the document derived from one of these directives be annotated as such and, if feasible, create links in the document to the actual directive.

Furthermore, a comprehensive list of all of the directives used should be listed in the front of the TRM. This will allow staff to have a better understanding of where the direction is derived from and allow them easy access to review these directives.

33. **Use the TRM as a resource for developing additional processes and training.**

The "Performance Standards" sections defined throughout the TRM were found to be clear and concise.  In the future, if the DOC determines that developing and implementing an internal or external review process is in their best interest, it could easily use this portion of the TRM to create the standards.

Insert a "Training" portion underneath each of the position descriptions that lists both mandatory and recommended training requirements for each position and ensure that each has a time frame in which the training must be completed. Again, if the DOC determines that developing and implementing a more structured and documented training program is in their best interest, they could easily use the majority of this TRM to create lesson plans.

# DC DOC and IRO Stakeholder Recommendations

34. **Establish a more structured and unified reporting process for untimely releases that provides an increased level of transparency to DOC stakeholders.**

While DOC appears to be actively tracking and documenting instances related to the untimely or erroneous release of inmates in their custody through the use of various reports, it is recommended the following procedures be implemented to assist in accomplishing this task.
   a. An untimely and erroneous release form be created.  At a minimum, this form would contain standard information, such as inmate name, DCDC number, date of birth, photograph, court identifier (District or Superior), type of erroneous release (early, late, erroneous), statutory release date, actual release date, a detailed explanation as to what occurred, action taken as a result of the incident, e.g. training, new procedures, disciplinary action, etc., and a routing section with signature blocks.
   b. Develop standardized memorandums to ensure prompt notification to the appropriate stakeholders, e.g., USMS, Courts, etc., in the instance of an untimely or erroneous release.
   c. Develop one standardized quarterly and annual report that synopsize and track all untimely and erroneous releases and has the ability to separate District Court cases from Superior Court case.
   d. Develop written standard operating procedures, or policy for erroneous and untimely releases.

e. Provide comprehensive untimely and erroneous release training to staff that directly relates to their individual roles in the process, and document the training provided.

## U.S. Marshals Service

### 35. Develop a Memorandum of Understanding (MOU) with the U.S. Marshals Service.

The DOC and USMS staff have been meeting monthly to work collaboratively on issues of mutual concern. These meetings appear to be beneficial and numerous items have been worked out regarding the paperwork flow process in District Court. Having a written document setting forth mutually agreed-upon procedures for the processing and handling of prisoners who are in the legal custody of the USMS and physical custody of the DOC would be beneficial.   The parties may also consider extending the agreement to cover all USMS prisoner operations within the District of Columbia, including those involving the District of Columbia Superior Court.

## U.S. District Court U.S. Marshals Service

### 36. Ensure the USMS-DC provides a specific explanation in the remand documents and uniform language for each explanation.
Collaborate with the USMS-DC to communicate the importance of this information and include the required provision of this information on remand forms in the MOU (or IGA). IRO staff interviewed expressed concerns that the USMS-DC does not always provide accurate descriptions or explanations in the remands documents, causing unnecessary delays and misguidance to the IRO staff in the process of completing intake or releasing inmates.

### 37. Standardize the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ directing DC DOC to release a USMS-DC inmate.

Currently, USMS staff ▮▮▮▮▮▮▮▮▮▮ IRO staff directing them to release specific inmates. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 38. *Release eligible USMS- DC District inmates directly from the court house.

Once DC DOC staff transport inmates to USDC for court proceedings, physical custody of the inmate is transferred to the USMS.  If the inmate receives a time served order, or other type of order making the inmate eligible for immediate release, the USMS should maintain custody and release directly from the court house and conduct the appropriate checks to ensure there were no detainers or warrants for the inmate.   On rare occasions, USMS-DC does directly release inmates from the court house.   For example, defendants brought in on new arrest charges who are not remanded to USMS custody are released directly from the court house.  Occasionally, a judge orders an immediate release from the court house.

Many years ago, the USMS-DC released a larger volume of inmates directly from the court house.  The USMS would have complete control over the inmate thereby removing any confusion or conflict with DC DOC regarding the appropriate course of action with the inmate. Procedures could be established, similar to those used in D.C. Superior Court, for DOC staff to retrieve a releasing inmate's property and medication, if any, and bring it to the court house to be issued prior to release. Many jurisdictions have a process for inmates to

be released directly from the court house. This practice leads to an efficient use of resources.

39. **Ensure any action that affects the custody status of USMS-DC prisoners are coordinated with, and authorized by, an authorized representative of the USMS-DC.**

Promptly notify authorized representatives of USMS-DC of receipt by the DOC of any court orders, come ups, orders to produce, writs, ASRs, detainers and other process or instructions that affect the custody status of USMS-DC prisoners that are received by the DOC from sources other than authorized representatives of USMS-DC.

Establish a notification protocol, which could be included in the MOU (or IGA), for matters affecting the custody status of USMS-DC inmates that occur after business hours.

# Appendix A: DC DOC Document Request List

1. Any and all written guidance for staff via memo, policy, or SOP regarding inmate release
2. Erroneous/ Delayed Release Policy
3. Erroneous/Delayed Release Notification Plan
4. Sentence Computation Policy and Procedure
5. Technical Resource Manual for Inmate Records Office
6. Prison Transfer Request Policy and Procedure
7. Release procedures
8. Transportation Policy
9. Quality assurance protocols
10. Staffing deployment plans
11. Staffing workload
12. Workflow management tools
13. Productivity management tools
14. Superior Court Administrative Order 07-08
15. Any other relevant Superior Court Administrative Orders
16. MOUs or contracts with the USMS, FBOP and Parole Commission
17. DOC Release Discrepancy Reports for the past 36 months
18. Any related reports or memos from the past 36 months related to erroneous/delayed releases, records management, sentence computation, court transfers and release procedures.
19. All erroneous/delayed release case information for the past 36 months
20. Overall statistics for intakes and releases over the past 36 months
21. List of lawsuits filed as a result of erroneous/delayed releases for the past 36 months

# Appendix B: TMG Team Biographies

**Anadora "Andie" Moss, TMG President, Project Advisor**
Andie Moss is founder and president of The Moss Group, Inc., a Washington, DC-based criminal justice consulting firm.  The Moss Group works throughout the country and is engaged in assisting public safety organizations in solving complex problems.  She was a pioneer in the work of assessing and addressing organizational and facility culture, sexual violence in confinement settings, and safety assessments of correctional facilities.  She also served as a subject matter expert to the National Prison Rape Elimination Commission and the PREA Review Panel. Ms. Moss was appointed by the White House to a two-year term on the education subcommittee of an Advisory Committee on Family Residential Centers administered by the secretary of Homeland Security.

Ms. Moss is published in professional periodicals, has held several leadership roles in professional organizations, and has received numerous honors for her work. Ms. Moss received her Bachelor of Science degree from the University of Georgia and her Master's in Education from the University of Idaho. She is a recipient of the Susan M. Hunter lifetime award of achievement.

**Kathleen "Kathy" Kenney, Project Director**
Kathleen M. Kenney has been a consultant with The Moss Group since 2017. Ms. Kenney joined the Federal Bureau of Prisons' Office of General Counsel (OGC) in 1992 as an honors attorney in the Legislative and Correctional Issues (LCI) Branch. She served as attorney advisor at the Federal Correctional Institution (FCI) in Talladega, AL, from July 1993-1996. She received the Assistant Director's Award for Exceptional Performance by an Attorney and the Director's Award for her assistance and work on prosecutions of inmates involved in the 1995 disturbance at FCI Talladega.

Ms. Kenney returned to OGC as an assistant general counsel in LCI in 1996. She also worked in the labor law branch prior to being promoted to associate general counsel for LCI in September 1999. Ms. Kenney was subsequently appointed deputy general counsel in March 2000, and in that capacity, was responsible for oversight of the litigation branch, legislative and correctional issues branch, labor law branch, and the six regional councils. She was appointed as an assistant director/general counsel in June 2004 and served in that role until her retirement in May 2017. Ms. Kenney received her bachelor's degree in Political Science from the Catholic University of America in 1988 and her Juris Doctor from the University of Notre Dame in 1992.

**Eric Wohltjen, TMG Consultant**
Eric Wohltjen has been a consultant with The Moss Group since 2018.  Mr. Wohltjen joined the Federal Bureau of Prisons in 1989 as a correctional officer and moved through the ranks as a legal instruments examiner, inmate systems manager, assistant prisoner transportation coordinator, chief of transportation and operations, and chief of training, policy, and correspondence. Through these positions, he was responsible for overseeing the contract and maintenance of the agencies ground transportation tracking system, which included 105 busses distributed nationally and was directly involved with the design, implementation, and activation of the Designation and Sentence Computation Center.

Since 2014, he has worked as a contractor with the United States Marshals Service in the Prisoner Operations Division where he provides consultation for management, organizational, and business improvement efforts. Mr. Wohltjen served as a corporal with the United States Marine Corps Military Police from 1984 – 1988 and as a sergeant from 1998 to 2002 with the U.S. Army National Guard.


**Robert "Bob" Helwig, TMG Consultant**

Robert P. Helwig has been a consultant with The Moss Group since 2018. Mr. Helwig joined the United States Marshals Service (USMS) in 1988 as a deputy U.S. Marshal. He served as the chief inspector and senior inspector with the USMS Investigative Services Division where he managed the 15 Most Wanted Fugitives, Major Case, Confidential Informant, Organized Crime Drug Enforcement Task Force, Sensitive Operations, and Undercover Operations Programs. From 2003 – 2006, he served as the assistant director for Fugitive Investigative Support with the International Criminal Police Organization (INTERPOL). In 2007, Mr. Helwig returned to USMS as the chief for the Office of Emergency Management and Security Programs Manager

In 2009, he joined the Department of Homeland Security as the assistant director of the U.S. Immigration and Customs Enforcement, where he directed a series of sensitive and complex security, risk management, law enforcement, and administrative programs.  Mr. Helwig received his bachelor's degree in Civil Engineering from the University of Delaware in 1988 and his juris doctor from Seton Hall University in 1993.

## Jose A. Santana

Mr. Santana has over 29 years of experience in the correctional field. He began his correctional career in the Puerto Rico Department of Corrections (PRDOC) as a Discipline Hearing Officer. He was also the Acting Director of the Rules and Regulations Division (PRDOC) from January 1989 until June 1991.

He began his Federal Bureau of Prisons (BOP) career as a Legal Technician activating MDC Guaynabo, Puerto Rico. He worked in positions of increasing responsibilities as a Case Manager at MDC Guaynabo, Puerto Rico and FCI Tallahassee, Florida; Case Management Coordinator at MDC Guaynabo; Unit Manager at FCC Beaumont, Texas; South Central Regional Designations Administrator, Dallas, Texas; South Central Correctional Programs Administrator, Dallas Texas. In November 2007, was selected as Associate Warden at MDC Guaynabo, Puerto Rico, where he remained until May 2010. Lastly, in May 2010, he was promoted to the Bureau's Chief of the Designation and Sentence Computation Center in Grand Prairie, Texas. He recently retired from the Bureau in December 2017.

## Katy Cummings, TMG Project Manager

Katy Cummings joined The Moss Group (TMG) in January 2014 as a project manager for both adult and juvenile correctional agencies. In this role, Ms. Cummings manages, facilitates, and coordinates the work of project teams to ensure the successful completion and delivery of all assigned projects. She is responsible for planning, monitoring, and execution of all project phases, and for ensuring that the requirements of all client project deliverables are met. She has managed numerous federal, state, and local contracts that include training and technical assistance, cultural and operational assessments, strategic planning, and curricula and program development.

Prior to joining TMG, Ms. Cummings worked with the National Crime Prevention Council on a variety of projects including national crime prevention campaigns, research and publication development, training and technical assistance, and community outreach. She has also worked in mental health facilities with at-risk youth as well as out-patient adults with cognitive and psychological disorders. She earned a Bachelor of Arts in Psychology from West Virginia University and a Master's in Community Psychology with emphasis in Forensics from the University of New Haven. She currently resides in Washington, DC.